HEARD APRIL TERM, 1873.

## STATE *vs.* HAYNE.

An indictment against an attorney at law for practicing without "authority or license," which does not allege that the defendant was in default for the non-payment of a sum imposed by law as a tax upon him by reason of his profession, as the ground of the charge, nor in any way point to the Act "to provide a general license law" under which the indictment was intended to be laid, is bad, and judgment thereon will be arrested.

A tax on professions or occupations is not forbidden by the Constitution of the State, either in terms or by implication.

For non-payment of a tax on business a penalty may be imposed, to be recovered by indictment, as for a misdemeanor.

Such a tax may be constitutionally imposed by a separate Act and take effect in the same fiscal year in which a tax on property is laid and collected.

In the Criminal Court of Charleston, July Term, 1872.

The indictment alleged that I. W. Hayne, late of Charleston, attorney at law, on the tenth day of April, in the year of our Lord one thousand eight hundred and seventy-two, at the said Charleston, and there on divers other days and times, between that day and the day of the finding of this indictment, to wit: on the first day of July, in the year of our Lord eighteen hundred and seventy-two, without any authority or license therefor duly had and obtained according to law, did carry on or conduct business as an attorney at law, against the form of the Act of the General Assembly, in such case made and provided, and against the peace and dignity of the same State aforesaid.

The defendant pleaded "not guilty," and a jury was duly called and sworn. The acting Solicitor stated that the defendant was indicted for carrying on business as a lawyer in violation of Section 10 of the Act of Assembly entitled "An Act to provide for a general license law," approved March 13, 1872, and, to maintain the issues on the part of the State, he called as a witness Samuel L.

Bennett, who testified that he is Auditor of Charleston County, that he knows the defendant, and knows that defendant has been carrying on business as a lawyer in the County of Charleston since the tenth of April, 1872, and that he knows that defendant has not paid the sum required by the said Act to be paid in such cases, and has declined to pay the same.

The defendant asked the Court to instruct the jury as follows, to wit:

That the indictment cannot be sustained—

1st. Because it is not unlawful to carry on or conduct business as an attorney at law, without a license therefor. That the "Act to provide for a general license law," under which the indictment is framed, requires every person engaged in the profession or calling of attorney at law to *pay* into the treasury of the County in which such person resides, *for the use of the State, a certain sum of money,* but does *not* require such person to take out a *license.* It is not made the duty of a lawyer to take out a license, nor is it declared unlawful to carry on or conduct such business without one.

2d. That the indictment cannot be sustained, because the said Act of Assembly is unconstitutional, null and void in this, that though called á "license law," it is in fact a tax Act, or Act to raise supplies, and as such is repugnant.

1st. To Article IX, § 1 of the State Constitution, which declares "that the General Assembly shall provide by law for a uniform and equal rate of assessment and taxation."

2d. To Article IX, § 2 of the Constitution, which declares "that a poll tax shall not exceed $1 on each poll."

3d. To Article IX, § 3 of the Constitution, which limits the taxing power of the General Assembly to "an *annual* tax sufficient to defray the estimated expenses of the State for each year."

4th. To Article IX, § 4 of the Constitution, which declares that no tax shall be levied except in pursuance of a law which shall distinctly state the object of the same, to which object such tax shall be applied.

5th. To Art. II, § 33 of the Constitution, which declares "that all taxes upon property, real or personal, shall be levied upon the actual value of the property taxed, or shall be ascertained by an assessment made for the purpose of laying such tax."

6th. To Art. I, § 20 of the Constitution, which declares that "no person shall be imprisoned for debt except in cases of fraud."

7th. That it is repugnant to the whole scheme of the Constitution in reference to the powers of taxation therein granted to the Legislature. That there is no special grant of power to the Legislature to be found in the Constitution to enact a law of this kind, and the Act is therefore repugnant to Art. I, § 41 of the Constitution, which declares that all powers not therein delegated to the General Assembly remain with the people.

The Court refused to give the instructions asked for by the defendant; and charged the jury that the defendant was indicted for not paying the license fee required by law, and that if they were satisfied of the truth of what was stated by the Auditor, they must find a verdict of guilty. To which the defendant excepted. The jury found a verdict of guilty. The defendant then moved in arrest of judgment on the following grounds, to wit:

1. Because the indictment does not charge that the defendant has carried on the business of attorney at law without paying the fee required by law therefor, but charges that he has carried on the business of attorney at law without having a license therefor, and it is not unlawful to carry on or conduct business as an attorney, at law without a license therefor. That the "Act to provide a general license law," under which the indictment is framed, requires every person engaged in the profession or calling of attorney at law to pay into the treasury of the County in which such person resides, for the use of the State, a certain sum of money, but does not require such person to take out a license, nor is it declared unlawful to carry on or conduct such business without one.

II. Because the said Act of Assembly is unconstitutional, null and void, in this, that though called a license law, it is in fact a tax Act, or Act to raise supplies, and as such is repugnant to the same provisions of the Constitution mentioned in the 2d instruction asked of the Court.

This motion the Court overruled, and sentenced the defendant to pay a fine of $20 and costs.

The defendant appealed.

*Hayne, Memminger, Porter,* for appellants.

*Whipper,* Solicitor, contra.

The following points and authorities were submitted for appellants in this case, and also in the cases of the *State* vs. *Chapeau & Heffron, (ante,* p. 378,) and *The State* vs. *Graham & Chapeau, (ante,* p. 380.)

The indictments in each of the above cases allege violations of one or more of the provisions of the " Act to provide for a general license law," approved March 13, 1872.

The first indictment charges that " I. W. Hayne, without any *authority or license* therefor, duly had and obtained, did carry on and conduct business as an attorney at law, against the form of the Act," &c.

The first count of the second indictment charges that R. Graham and F. F. Chapeau, " without any *authority or license* therefor, duly had and obtained according to law, did engage in the business of selling goods, wares and other merchandise, to wit: horses and mules, and bridles and saddles, and harness, against the form of the statute," &c. The second count of same indictment charges that said defendants, " without having paid into the County Treasury of the County in which the livery stables by the said Graham & Chapeau is kept, then and there situate and kept, for the use of the State, the sum of money required by law to be paid according to the rental value of said livery stable, did engage in the business of selling horses, mules and other goods, wares and merchandise, against the form of the statute," &c.

And the third indictment charges that F. F. Chapeau and J. F. Heffron, " without any *authority or license* therefor, duly had and obtained according to law, did then and there carry on their business of vending saddles and other goods, wares and merchandise, against the form of the Act," &c.

To the first indictment, the defendant pleaded " not guilty," and asked the Court to give certain instructions to the jury, which are set forth in the brief in that case. The Court refused to give the instructions asked for, and charged the jury: " that the defendant was indicted for not paying the license fee required by law, and that if they were satisfied of the truth of what was stated by the Auditor, they must find a verdict of guilty." To which charge the defendant excepted. The jury rendered a verdict of guilty, and thereupon the defendant moved in arrest of judgment upon the grounds stated in the brief. This motion

the Court refused and passed sentence that the defendant pay "$20 and costs." From this judgment the defendant appeals.

The instructions asked for and the motion in arrest of judgment depend upon and embrace the same principles of law and may be considered together. The two points made and distinctly stated in, and which fairly arise upon, the record of the case, are:

1st. Is the indictment, as framed, sufficient in law to sustain the judgment of the Court? and

2d. Is the Act of March 13th, 1872, consistent with, or repugnant to, the Constitution of this State?

The same points are presented by the records in the other two cases. In each of them a general demurrer was filed, and in each the demurrer was overruled and the defendants found guilty. Motions in arrest of judgment were likewise made and overruled in each case, and sentence passed upon the defendants, from which they now appeal to this Court.

Appellants ask that *all the points* arising upon the records in these cases may be considered and decided by this Court.

1. The indictment against I. W. Hayne is defective and insufficient in law, in that it charges that the defendant carried on business as an attorney at law "without any *authority or license* therefor, duly had and obtained," whereas the charge should have been that he carried on said business "without having *paid into the Treasury of the County* in which he resides, for the use of the State, *the sum of ten dollars.*" The only duty imposed on any person or persons carrying on or conducting any business named in the Act is "to *make return* of his or their respective occupations or business, under oath, to the Auditor of his or their respective Counties," within certain times limited in the Act, "and to *pay into the Treasury* of his or their respective Counties," on or before the dates therein specified, "the sum or sums required to be paid on his or their respective occupations or business."—See § 13. The Act nowhere makes it the duty of such person or persons to take out or have a license, nor enacts that it is unlawful to carry on business without one. Section 15 makes it the *duty of the Treasurer,* upon the receipt of the first quarterly instalment of the sum or sums specified to be paid upon any occupation or business, to give the person paying the same a *certificate to the Auditor,* specifying the sum paid and the occupation on which it was paid, and the *Auditor,* upon presentation of the certificate, is *authorized and required to issue a license, &c.*

This Section imposes certain duties, then, upon the *Treasurer* and *Auditor*—*they* are "authorized and *required*" to do certain things, but *no new duty is imposed upon the citizen*—the citizen has performed his *whole duty* when he has made return under oath, and paid the sum required within the time designated in the Act.

2. The same defect and insufficiency exist in respect to the first count in the second indictment, and to the third indictment—the charge in each is that the defendants carried on the business named "without any authority or license therefor duly had and obtained," whereas they should have been charged with having carried on said business "without having *paid* into the Treasury of the County in which they carried on such business, for the use of the State," the sum required by law to be paid in such cases.

3. The first count of the second indictment, and the third indictment, are moreover defective in this: That they do not charge what the alleged sales of goods, wares and merchandise *amount to annually*. The Act prescribes that any person or persons engaged in selling or vending goods, wares, merchandise, &c., shall pay into the Treasury, &c., certain sums, varying in amount from $250 to $5, according to the amount of the "annual sales" of such person or persons.—See § 4. And the penalty for *not paying* is a fine "not less than double the amount of license imposed, and imprisonment," &c., &c., "either or both, at the discretion of the Court." It is manifest, therefore, that unless the *amount* of the "annual sales" is alleged, the record does not furnish the Court with sufficient data to enable it to impose a fine of "not less than double the amount of license imposed."

4. The second count of the second indictment cannot be sustained, because the Act omits to declare *what sum* a livery stable keeper shall pay. "Every hotel, inn, *livery stable*, tavern or saloon," it is enacted, "shall be classified and rated according to the rental value thereof, and every keeper or keepers of the same shall be required to pay into the County Treasury in which such hotel, inn, tavern or saloon" (*livery stable* being omitted) "is kept," &c., "the sums, according to said rental values, as follows, to wit:" and then the Section proceeds to specify the sum to be paid by "such hotel, inn, tavern, or saloon," again omitting livery stables.

The foregoing objections are, to a certain extent, purely technical, and though appellants think them sufficient in themselves to quash the indictments, yet they are presented chiefly with a view to

strengthen and give force to some of the positions taken in regard to the validity of the Act under which the indictments are framed. This latter point is the one which appellants desire to bring most prominently forward, and they ask that it be considered and decided by the Court, whatever conclusion may be arrived at in regard to the other points presented.

In considering the constitutionality of the Act we must enquire:

*First.* Whether it is properly termed a " license law."

*Secondly.* If a " license law," does the purview of the Act establish as its object a regulation for the purpose of *police,* or does it shew that the Act was passed *with a view to revenue,* and solely as a means of " *raising supplies* "—that it is in fact a " tax Act."

And, *Thirdly.* If a " tax Act," or passed with " a view to revenue," has the General Assembly exceeded its powers of taxation in enacting such a law.

1. In determining these questions we must look to the enacting part of the Act and not to its title.—Dwarris on Statutes; *State* vs. *Allen,* 2 McC., 61.

2. It is a misnomer to call the Act of 13th March, 1872, a " license law "—though *called* a license law, it is, in fact a " tax Act." The command is to *pay money for the use of the State.* The *license* is a mere *incident,* intended as a convenience to the person who has paid. It is simply a *receipt* for the tax.

3. But assuming that it is properly called a " license law," is it to be referred to the *police power* of the Legislature, or to the *taxing power ?*

The limit to the exercise of the *police* power is this: The regulations must have reference to the safety, comfort or welfare of society ; they must be, in fact, *police regulations,* and the fees exacted must bear some relation to the expense of issuing the license and of enforcing the regulations. The Act of March 13 is manifestly not of this class. It contains none of the requisites of a police regulation, and cannot, therefore, be referred to the *police power* of the Legislature.—*Ash* vs. *The People,* 11 Mich., 347 ; *People* vs. *Jackson,* 9 Mich., 307 ; Cooley's Cons. Lim., 201, 576, 578.

4. Where license fees are exacted with a view to *revenue,* the license fee is only a species of *taxation,* and must be referred to the *taxing power* of the Legislature.—*License Tax Cases,* 5 Wallace, 462 ; *Brown* vs. *State of Maryland,* 12 Wheat., 555 ; *Ward* vs. *State of Maryland,* 1 Amer. Rep., 54; Cooley's Con. Lim., 496.

5. The Act of March 13 is then either a *Tax Act*, though *called* a "license law," or, if a license law at all, it "requires the payment of a license fee by way of *raising a revenue*," and, in either case, we must refer to the "*taxing power*" of the Legislature, in order to determine whether the General Assembly has power to tax in the mode and manner prescribed in the Act.

6. Referring, then, to the *taxing power* of the Legislature, the Act in question is repugnant to the Constitution:

1. Because the rates of taxation are not "*uniform and equal*," which is an essential requisite of a valid tax Act—Section 1, Article IX, of the Constitution; *Bank* vs. *Hines*, 3 Ohio, N. S., 15; *Weeks* vs. *City of Milwaukie*, 10 Wis., 258; *Knowlton* vs. *Supervisors of Rock Co.*, 9 Wis., 410; Cooley's Cons. Lim., pp. 503, 504.

2. If regarded as a "poll tax," it is repugnant to Article IX, Section 2 of the Constitution, because the tax "exceeds $1 on each poll."

3. It is repugnant to Article IX, Section 3 of the Constitution, because "an annual tax sufficient to pay the estimated expenses of the State" is otherwise provided for, and the taxing power of the General Assembly is limited to the levying of *one tax annually*.

4. It is repugnant to Section 4, Article IX of the Constitution, because the tax is not "levied in pursuance of a law which states its object;" there is no object stated in the Act to which the tax shall be applied.

5. It is repugnant to Section 20, Article I of the Constitution, which declares that "no person shall be imprisoned for debt except in cases of fraud." The penalty for *not paying* the tax, or debt due to the State, is fine or imprisonment, either or both, in the discretion of the Court, whether the failure to pay arise from fraud, inability to pay, or wilful neglect.

6. The Act is repugnant to the *general scheme* of the Constitution in reference to taxation.

7. And, lastly, there is no *express grant* of power to the Legislature, under the Constitution, to enact a license law for the purpose of raising a revenue, and the Act is, therefore, repugnant to Article I, Section 41 of the Constitution.

Aug. 27, 1873.    The opinion of the Court was delivered by

WILLARD, A. J.    The indictment is insufficient to sustain the judgment. It does not allege that the defendant was in default for

the non-payment of a sum impossed by law as a tax upon him, by reason of his occupation as an attorney, as the ground for the charge of conducting such business without "authority or license." Nor does the indictment in any way point to the license Act as the foundation of such charge. Unless the indictment can be supported under the license Act it is bad. It cannot be supported under that Act, for it does not allege that which, under the Act, constitutes a misdemeanor, namely, carrying on such business without paying the tax imposed, nor in any manner refer to the Act so as to point out, even indirectly, the ground of the wrong charged.

This view is sufficient to dispose of the whole case, but as both the defendant and the Attorney General have pressed this Court for a decision on the question whether the Legislature had constitutional authority to enact a tax law imposing taxes of the character imposed by the license law, and as the question is of public importance, we will consider and decide it.

The question to be considered arises upon a request for certain instructions to the jury which was refused by the Court. These instructions resolve themselves into a single proposition, to the effect Section 10 of the Act entitled "An Act to provide for a general license law," approved March 13th, 1872, (15 Stat., 195,) is unconstitutional and void, in so far as it attempted to impose on the defendant, as an attorney at law, the payment of the sum of ten dollars, in the nature of a tax, for the use of the State, and that the provisions of Section 17 of that Act, making it a misdemeanor to carry on such business without first paying the amount so imposed and charged, are inoperative and void, and, therefore, insufficient to support the indictment under which defendant has been convicted.

If Section 10 of the Act in question was valid, there can be no doubt of the power of the Legislature to make the prosecution of that business without payment of the tax imposed by that Section a misdemeanor. Whether attaching the penalty of imprisonment to such offense would be in contravention of the clause of the Constitution abolishing imprisonment for debt, is a question that need not be considered here, for no part of the judgment before us imposes the penalty of imprisonment on the appellant.

The question then presents itself, is the provision of Section 10 imposing a tax of ten dollars, for the use of the State, on persons engaged in the profession or calling of an attorney at law, unconstitutional and void ?

It is contended that the Constitution indicates the mode in which the revenues of the State are to be raised ; that an annual tax on property, real and personal, is the mode sanctioned by the Constitution ; that there is a clear intent expressed that ordinary expenditures and annual deficiencies should be provided for from this source of revenue; that this amounts to such an exhaustive regulation of the taxing power, that it is not competent for the Legislature to authorize the imposition of taxes in any other mode than that prescribed.

For the purpose of examining the merits of the rule of constitutional construction involved in the objection just stated, we will assume, without particular examination, at the present stage of the discussion, that the Constitution makes it the duty of the Legislature to provide, by an annual tax, to be laid upon property, upon the basis of actual value, and according to a rate uniform as to all persons and localities within the State, and which shall afford a sufficient revenue to meet all the demands upon the State for the fiscal year to which such tax relates, whether these demands are of the class of ordinary expenses, or of deficiencies of a previous year. We will also assume, for the same purpose, that the Constitution does not, in terms, inhibit a resort to other modes of raising revenue by taxation. We will, then, proceed at once to consider whether there is any rule or principle of constitutional construction that authorizes an implication from the express terms there employed, the effect of which implication is to limit the taxing powers of the Legislature to that particular mode of exercise expressly enjoined, and to deprive it of efficiency when exercised in any other mode than that prescribed.

The propositions which we have just assumed are sufficient premises to enable us to lay hold of the sound rule and principle of construction that should be carried into the text of the Constitution, and will be found, when we come to look into the Constitution, to form a statement more favorable for the argument of appellant than the Constitution itself authorizes.

The taxing power must be regarded as the primary power of government, as the maintenance of peace is its primary duty. This results from the fact that its end is the acquisition of means upon which the exercise of all the powers of the government practically depend. It is indispensable, because the validity of the government depends upon it. The inexorable necessity that is laid

upon it is to get adequate revenue. Subject to its fitness to attain this end, it should be so shaped in its exercise as to distribute fairly the burden imposed on all that should contribute. It should not be tied up with any theory of what is the most equal or productive mode of raising revenue; but, as a constituent function of government, it should be competent at all times to carry out the views of economic policy that may for the time being control the legislative mind.

It surely does not need argument to show that these propositions are founded in truths that lie beyond all theory and speculation. ·

Economic policies must change, whether under the influence of experience or theoretical considerations. If, then, any line of economic policy is attempted to be exclusively enforced by the Constitution, the Constitution itself must be in a state of change to keep pace with the different views entertained at different times as to such policy. To attempt to conform the structural scheme of the government to a strict and exclusive relation to what may chance to be the peculiar ideas of the political body in regard to matters of administrative and economic policy at any particular time, is to deprive it of elasticity, and, consequently, of vitality. As well might we attempt to improve the human race by producing a distinct and peculiar skeleton for a laborer, an artisan, or professional man, containing peculiar adaptations to his customary employment.

The entire system of constitutional construction, as matured in the American Courts, rests on the recognition of these ideas as constituting a ground of distinction between fundamental and ordinary legislation.

Looking, then, to the general object had in view by the Constitution, and the nature of the subject under consideration, and we may safely affirm that when the Constitution undertakes to regulate the exercise of the taxing powers, by prescribing the mode by which the revenues of the State shall be raised, in the absence of the expression of a clear intent to exclude other modes of raising revenue than that prescribed, such regulation must be construed, while imposing a political duty on the Legislature, as not circumscribing its constitutional functions, so as to exclude it from authorizing a resort to other means of raising revenue, when in its judgment an exigency exists calling for resort to such auxilliary means of raising revenue.

It must be borne in mind that we are not considering the pro-

priety of lessening the force conveyed by the primary and ordinary sense of terms employed in the Constitution on any theory of what ought to be said or what ought not to be said in a Constitution. On the contrary, we are considering whether we are bound to add to the natural force and effect of terms employed, on the ground that such increased effect was in the mind and contemplation of the framers of the Constitution as apparent from the terms employed. As we are called upon to frame words on the principle of implication, to enlarge the expressed intent, we are bound to look to it that our emendations of the text flow from fixed and necessary principles of constitutional construction. If the Constitution should lose symmetry in consequence of our judicial exposition of its terms, the responsibility would not rest on the framers of that instrument. It is in this light that it becomes important that we should have in view what is conformable to the nature of a Constitution of government, and what is non-conformable to it.

It is true, as a general rule, that where powers are derived from an instrument that prescribes the mode in which they must be exercised, they cannot be legitimately or effectively exercised in any other mode than that prescribed.

It may, perhaps, be conceded that it makes no difference, as it regards the applicability of the rule, whether the instrument conferring such powers is a contract between individuals, a statute, or a Constitution of government. It is not the nature of the instrument, but the nature of the power and the object of its creation, that is to determine whether the prescribed mode of its exercise is to be regarded as a circumscription of the power itself or a direction as to its exercise, inferred by some penalty falling short of an entire destruction of the whole force and effect of the power itself.

There is no judicial authority of acknolwedged weight sanctioning the consequences that would result from the application of that rule to the case of a legislative body clothed with general legislative power, and in respect of a power vital to the existence of the State, the intermission of which would derange the entire machinery of the government.

Such a case cannot be brought within the idea on which the general rule is based. It starts off with assuming that there is no absolute and indispensable necessity for the exercise of the power independent of the case involved in the limitations to which it is subjected. The rule could not conclude that the act contemplated

by the power ought not to be done, unless done in the way prescribed, if the fact stood in full view, that the failure to exercise the power was in itself a greater wrong, and a public evil of greater magnitude, than its performance in an improper manner would be.

But the proposition we are now considering does not render it necessary for us to say that the general rule adverted to is or is not a test of the validity of political powers relating to a vital public function when the conditions of the case fit those of the rule. In the present case we must assume that there are no words in the Constitution that declare that there shall be no exercise of the taxing power except in the mode specifically prescribed, for that is demanded by the terms of the assumption under which we are examining the rule of construction. As we have already said, if such words are to be read in the Constitution, they are to be put there on the principles of construction. We shall hereafter look into the text of the Constitution to verify this assumption.

The case we are considering is one where in one clause of the Constitution general taxing power is conferred on the Legislature, and in another part of the instrument that body is required to provide for an annual tax of a particular kind sufficient to meet all the requirements of the State; and the question is, can the Legislature, under any other circumstances, resort to the use of any other kind or mode of taxation than that specifically prescribed.

Every power to which the general rule is applicable must be regarded as a particular and specific power, in contra-distinction to a general power, while by the terms of the Constitution and the nature of the power, the power of taxing must be regarded as a general power, though attended by directions as to its use.

If we consider the object for the sake of which the taxing power is lodged in the hands of the Legislature, we shall conclude that the purpose intended by the general rule just stated does not embrace the case of a general grant of taxing power to a legislative body.

There are but two modes in which government can secure the means of maintaining itself in efficiency. One is by arbitrary seizure, taking, when and where it can most conveniently be found, that which may be deemed necessary to enable the government to perform its functions; the other is by systematic proceedings for the purpose of raising money, having regard to the principle that the burdens of supporting the government should be distributed fairly

according to some equitable rule of contribution. That sovereign States will and must resort to extraordinary means of self preservation, in exigencies of peril, is settled by the experience and common judgment of all mankind. Any attempt in a written Constitution to restrain the possible exercise of such power in emergencies would not conform to the nature of government or the views that mankind entertain of duty in cases of extraordinary peril, and would be likely to be disregarded in such cases. The suggestion of prudence is that the Legislature should be clothed with powers sufficiently elastic to eliminate such necessity, as far as possible. To do this they must be able to adopt the mode of raising revenue to the condition in which they find public affairs from time to time.

To indicate a mode by which the current, ordinary, or anticipated expenditures of the Government should be liquidated is not necessarily inconsistent with the conservation of the power of resorting to extraordinary means under the impelling power of extraordinary and unanticipated exigencies. It is only when the habitual mode of raising revenue is claimed to operate to exclude all other modes that such restrictive enactments threaten the integrity of the governmental powers.

Extreme rigidity in the forms through which sovereign authority is required to be exercised is a temptation to arbitrary assumptions of authority. If we should hold the express provisions of the Constitution requiring certain taxes to be imposed to exclude a resort to all other taxation, we would impair the strength of the Constitution by narrowing the scope and efficiency of the vital powers communicated to the public agencies established in order to exercise its functions and discharge its duties. It is proper to observe that the argument seeking to impose such rigid limits to the exercise of public authority proceeds upon certain assumptions that will be briefly noticed.

It is assumed that experience has established that limitations imposed by the Constitution on the powers and modes of action of the Legislature have a salutary effect. This may be conceded, for the tendency to increase the limitations in this direction, manifested in recent constitutional changes in various States, exhibits this conviction of the public mind. The argument assumes also that the narrower the limit within which the exercise of legislative powers can be conferred, the less likely are abuses of legislative power to arise. This assumption has no support in the experience of States.

If the limitation imposed tends to impair the integrity of the legislative authority, by separating from it something that ought, according to the nature of such authority, to appertain or belong to it, it can be positively affirmed that such a limitation will result injuriously, and that affirmation can be made on general principles prior to any actual demonstration of the practical results flowing from it.

The question as to what abridgment of the unlimited power of legislation can be made without the destruction of some important legislative function, is one that ought not to be speculatively determined. An American Constitution grows out of the habits, necessities and practical wants of the people; it is not the result nor product of *a priori* reasoning. It is only when the want of a modification of the fundamental laws has become generally felt throughout the body politic that a movement of adequate force to accomplish such modification can be successfully set on foot. It is true that the existence of a demand for some specific modification is frequently seized upon as the occasion of opening the whole Constitution to discussion and revision, in much the same manner in which a publication that has outlived the peculiar popular taste that called it into existence is reproduced and conformed to existing taste. This practice is, however, exceptional. Fortunately, it has not yet been extended to the Constitution of the United States, and it is to be hoped that the early advent of constitutional adolescence will render absolute this mode of dealing with the fundamental law, and allow the expressions employed in the distribution and limitation of the great powers of government to become venerable so far as that can be permitted consistently with progressive adaptation and improvement in subordinate matters.

To originate a new line of constitutional construction when the antecedent experience has not fully prepared the way for such step of progress, is to deal blindly and unskillfully with the most complicated and intricate organization that is placed within the control of human agency. We are not at liberty to enter upon the origination of novelties in this department of legal science.

Experience has shown that certain subjects of legislation may, with safety and propriety, be removed from the legislative control, such as the power of passing *ex post facto* laws, or of impairing the obligation of contracts. It has also justified the imposition of certain restrictions and conditions that may become tests of the

validity of legislative action, such as the requirement that compensation shall be made to an individual where it is sought to take his property for public purposes. But the attempt to tie up the action of the Legislature in the course of exercising one of the great fundamental powers of government, such as the taxing powers, to a single line of action, dictated as a formula for all times and exigencies, may safely be characterized as an untried experiment not yet commended to the practical sense of the American political communities as worthy of trial.

Nothing can be more conformable to the nature and true office of a Constitution of government than to set up standards and measures of right, derived from the moral convictions of the public mind, and designed to be applied to the legislative power, in order to secure the integrity of the State, the individual, and the laws, from legislative abuses; but when it shall attempt to reduce all possible modes of providing means for the security and efficiency of the government to one technical mode of proceeding, as it would frame a writ or mode of forensic proceeding, it will be found to have received its shape under the control of ill-informed and speculative minds, rather than that of experienced and practical minds.

We have thus far attempted to consider the true rule of constitutional construction, applicable to the present subject, independently, as far as possible, of the special provisions of our Constitution, and testing it rather by what is common to all similar instruments than by what is peculiar to our own.

Following this line of inquiry, we have assumed certain propositions as the basis of our inquiry. We have assumed that the Constitution makes it the duty of the Legislature to provide, by an annual tax laid upon property, on the basis of actual value, and according to a rate uniform as to all persons and localities within the State, and which shall afford sufficient revenue to meet all demands upon the State for the fiscal year to which such tax relates, whether these demands are of the class of ordinary expenditures, or deficiencies of an antecedent year; and we have also assumed that the Constitution does not, in terms, inhibit a resort to other modes of raising revenue. We then proceeded to inquire, on the ground of such assumptions, whether there was any rule of constitutional construction that authorized an implication, from the express terms thus employed, the effect of which was to

limit the taxing power of the Legislature to that particular form or mode of exercise expressly enjoined, and to deprive it of efficacy where exercised in any other mode than that prescribed. We came to the conclusion that, where the Constitution undertakes to regulate the exercise of the taxing power, by prescribing the mode by which the revenues of the State shall be raised, in the absence of the expression of a clear intent to exclude other modes of raising revenue than that prescribed, such regulation, while it must be construed as imposing a political duty on the Legislature, cannot be held as circumscribing its constitutional powers so as to exclude a resort to other means of raising revenue where, in its judgment, an exigency exists calling for a resort to such auxilliary means of raising revenue.

As we proceed to examine the particular features of our Constitution, it will be found that the true means of solving the present question lie within the principles of the proposition just stated.

It is necessary to consider very fully those parts of the Constitution that have a bearing on the question as to what is the nature of the power of imposing taxes as conferred on the Legislature, and whether its exercise has been limited in such a way as to preclude that body from authorizing the imposition of a tax of ten dollars on all persons carrying on the business of an attorney at law within the State, for the general use of the State Government. For the sake both of exactness and convenience it is preferable to consider the law imposing this tax from this restricted point of view, rather than with direct regard to all its features, as the right of the Legislature to impose the particular tax on the defendant covers the question of the validity of the law as a whole.

The only features of the tax imposed that need be considered as bearing upon the question of its validity under the Constitution, are, that it is not a tax on property, *ad valorem*, and the proceeds of the tax may be applied to any of the uses of the Treasury, including the payment of current and ordinary expenditures, that, under the Constitution, as it is contended, should have been provided for by a tax on property. It is also to be observed that the license law, as it is called, was passed in a fiscal year in which a tax on real and personal property was levied and collected. The questions to be considered arise out of these facts. What, then, is the nature of the taxing power in the hands of the Legislature? We have already said what it is in view of that science that deals with the exposition

of constitutional law upon principles and rules derived from all systems of government, but particularly those based on written Constitutions. It remains to enquire whether the language and sense of the Constitution imposes any different or peculiar character on these great fundamental functions of government.

Section 1, Article II, declares that "the legislative power of this State shall be vested in two distinct branches, the one to be styled the 'Senate,' and the other the 'House of Representatives,' and both together the 'General Assembly of the State of South Carolina.'" Although the particular office of this Section is to fix certain important features of the body through which the function of legislation is to be exercised, yet it describes in an authoritative way the nature of the power thus vested. It is no less than the legislative power of the State. It is not such and so much of the legislative power of the State as were intended to be used by that particular body, but it was the whole legislative power of this State, its whole capacity of making laws and providing the means for their enforcement. It was not intended that the Legislature should exercise this power without limitation and restraint, for the Constitution that uses these words of grant imposes many such restrictions and limitations affecting the extent to which it may be effectively exercised. The form of expression here employed shows that the people of South Carolina entertained the same view of the nature of legislative power that is accepted by other similar communities, and intended that it should receive, in this respect, the construction ordinarily put upon grants of such powers in other similar instruments; that is to say, they intended a general grant of that branch of governmental power and faculty described as the legislative power of the State, though subject to many restrictions affecting its exercise. But it has been argued that Section 41 of Article I narrows this from a grant of general capacity to one of limited powers. It is said that the powers of the Legislature of South Carolina must be held to be special and enumerated powers, like those of the Congress of the United States, and that such as are not in terms granted must be regarded as withheld and retained by the people, and that such is the force and effect of Section 41, Article I.

That Section is as follows: "The enumeration of rights in this Constitution shall not be construed to impair or deny others retained by the people, and all powers not herein delegated remain

with the people." The true effect of this declaration is, that it reserves to the people whatever is not granted by the instrument ; as, for instance, the right to make changes in the form of government is not granted, and, under this clause, remains in the hands of the people, capable of exercise when they may see fit so to do. As the legislative power is granted in express terms, importing a grant of general powers, such general powers of legislation cannot be regarded as reserved to the people under this Section. Such general language as that contained in Section 41 of Article I cannot be allowed such force and effect as to change entirely the nature of legislative power, and to introduce anomalous ideas in the structure of the government.

The last Section of Acticle II, organizing the legislative department, prescribes that "all taxes upon property, real or personal, shall be laid upon the actual value of the property taxed, as the same shall be ascertained by an assessment made for the purpose of laying such tax." There is no special grant of authority to levy taxes contained in this Article. The right to levy taxes is conferred under the grant of general legislative power. Section 33 assumes the existence of such power, and undertakes to prescribe the rule of its exercise, where such exercise consists in the imposition of a tax of a particular description, namely, taxes upon property, real and personal. If the Constitution had intended to deprive the Legislature of a function that it had always enjoyed in common with similar bodies, and to confine it to that mode of taxation referred to in the Section under consideration, it is impossible to conceive that that Section would have taken the form in which it stands in Article II. It would probably have read thus: "All taxes shall be laid upon property, real and personal, according to the actual value of the property taxed," &c.

Or, inasmuch as it was elsewhere in the Constitution provided, that there should be a certain poll-tax imposed, it would have read, "all taxes except the poll-tax, as hereinafter provided, shall be laid on property, real and personal, &c." The difference between the Section as it stands, and as it would stand in the case supposed, is precisely this : in the one case it would amount to a constitutional declaration of what taxes shall be levied, while in the other case no such declaration is made.

The limitation imposed as to taxes of a particular class implies the possibility of other modes of taxation to which such limitation would be inapplicable.

A comparison of the provisions of Sections 36 and 37, Article I, and Section 33, Article III, will lead to the same view of the intentions of the Constitution. The Sections first named appearing in the Bill of Rights, and Section 33 in the Article fixing the powers of the Legislative body, must be regarded as framed while the framers had in view the establishment of a proper balance between the powers of the Legislature and the rights of individual members of the community, and if it was intended to make any cardinal changes affecting this balance, here is the place where we would naturally look for evidence of such intention. What, then, say these Sections? Section 36 says, that "all property subject to taxation shall be taxed in proportion to its value." Section 37, that "no subsidy, charge, impost tax, or duties shall be established, fixed, laid or levied under any pretext whatever, without the consent of the people, or their representatives lawfully assembled." The clear implication from these Sections, taken together, is that a much larger range of modes of collecting revenue is open to the Legislature than that involved in the imposition of a tax on property. So that, instead of finding the powers of the Legislature limited in this important part of the instrument, we find the people and their "representatives legally assembled" put in the same category, as it regards the right to resort to extraordinary as well as ordinary means of support and aid to the government.

If, then, the construction contended for must prevail, it can only be regarded as arising from the provisions of Article IX of the Constitution, which we will proceed to consider.

Art. IX is entitled "Finance and Taxation." Its leading provisions relate to taxation and other sources of revenue for meeting the current and ordinary expenses of the government, including the payment of the deficiency of revenue in any given year to meet the ordinary expenses of that year; it fixes the class of exceptions from taxation that may be allowed by the Legislature; it provides for periodic assessments of the value of real property; it authorizes the creation of public debt to meet extraordinary expenses, and establishes the mode and manner in which such debt must be authorized and contracted; it makes provision for the exercising of the powers of taxation by municipal corporations, and lays restrictions on such exercise; it regulates the issue of evidences of debt by the State, provides for the custody and payment of public moneys, and for the accountability of fiscal officers; it establishes the fiscal year;

finally, it forbids the payment of debt contracted in aid of rebellion.

Sec. 1 is as follows: "The General Assembly shall provide by law for a uniform and equal rate of assessment and taxation, and shall prescribe such regulations as shall secure a just valuation for taxation of all property, real, personal and possessory, except mines and mining claims, the proceeds of which alone shall be taxed ; and, also, excepting such property as may be exempted by law for municipal, educational, literary, scientific, religious and charitable purposes."

Unless this Section can be construed as inhibiting other taxes than those on property, except the poll tax, provided for in the next Section, there is nothing in Article IX that can, by any possibility, be construed as limiting the Legislature to that particular mode and form of taxation. We will first consider this Section standing by itself, and next as connected with the third Section of the same Article.

Section 1, apart from its provisons in regard to exemptions, advances two ideas; first, equity in all taxation and assessment, and, second, valuation, as the means of securing such equality, in the case of taxes on property. The first clause, namely, "the General Assembly shall provide by law for a uniform and equal rate of assessment and taxation," is not, by its terms, applicable alone as peculiar to taxes on property. It does not use the word value, which is significant of taxation as applied to property. That expression occurs in the second clause in connection with the subject to which it belongs, namely, taxation of property. These clauses are connected by the conjunction "and ;" accordingly their grammatical relations admit of their bearing independent force and effect, if the nature of the subject-matter admits of it. It is clear that the first clause, establishing the rule of equality, must be regarded as affecting the poll tax, authorized by the second Section. The maximum of that tax is fixed at one dollar per poll, but there is nothing in the last named Section, standing by itself, that makes it necessary that all polls should be considered equally in regard to that tax. The first clause of Section 1 supplies this deficiency, and, we must conclude, was intended to supply it. It therefore follows that the first clause prescribing uniformity was intended to have and has an operation beyond the scope of the second clause, to the extent, at least, of regulating one form of tax not embraced

in the second clause, namely, the poll tax, to which the principle of valuation is inapplicable. If, then, the first clause is not confined to its operation to the class of taxes mentioned in the second clause, as calling for valuation, it may be affirmed that the object and intent of the first clause was to introduce the principle of equality and uniformity into any and all classes of taxes that might be authorized by the Legislature, and that it was not intended as a means of ascertaining what taxes might and what might not be levied. This being the true construction of the first clause, the second admits of no construction that can confer on it an import beyond that plainly signified by the terms employed, namely, "that it should be the duty of the Legislature to provide the means of securing equal and just valuation on all property subject to taxation, the 36th Section of Article I, and the 33d Section of Article II, having already fixed upon value as the means of distributing the burden that ought to be borne by property, on all property that should contribute to bear it."

The only other Sections in Art. IX that contemplate any particular kind of tax are Sec. 2, relating to the poll tax, Sec. 5, relating to exemptions from a property tax, Sec. 6, providing for the first and succeeding assessments of real estate ; and these Sections throw no light on the subject under consideration. It has been argued that Sec. 3 of Art. IX bears on this question ; but that view is clearly erroneous. That Section is as follows : " The General Assembly shall provide an annual tax sufficient to defray the estimated expenses of the State for each year, and whenever it shall happen that such ordinary expenses of the State for any year shall exceed the income of the State for such year, the General Assembly shall provide for levying a tax for the ensuing year sufficient, with other sources of income, to pay the deficiency of the preceding year, together with the estimated expenses of the ensuing year." Comparing this Section with Sec. 7, authorizing the creation of public debt, in order to meet extraordinary expenditures, it becomes evident that the leading object of Sec. 3 is to require that ordinary expenses, embracing the expenditures necessary for maintaining the government shall be met from year to year, and paid from the annual income and resources of the State, and that public debt shall not be created for the purpose of liquidating that class of expenses. The importance of such a provision as a means of preventing the improvidence of one generation from casting a burden of un-

necessary debt upon a successive generation, is obvious, and fully explains the object and intent of Sec. 3. Inasmuch as such expenses recur annually, it was proper that an annual income should be provided, and as the income of the State must in the main arise from taxation, the declaration that the Legislature shall provide an annual tax was the natural and convenient form of securing the object already referred to.

There is no limitation as to the kind of tax to be annually imposed contained in this Section. Whatever answers the description of a tax, and may be imposed annually, is within the terms of this Section. This Section, standing by itself, so far from enforcing the imposition of any particular kind of tax, is wholly indifferent as to kind, but intent on its annual recurrence, and sufficiency to meet annual expenditures. As "other sources of revenue" are spoken of in this Section, it is obvious that the object of the Section was not to render it necessary that a particular and designated fund should be raised for annual expenses, and that resort should be had to no other, but that its chief object was to designate, imperatively, annual taxation as a means of making good any insufficiency of income from other sources to meet current annual expenditures and deficiencies of a preceding year. In a word, this Section does not designate any fund as the primary fund for the payment of annual expenditures and deficiencies, but conforms itself simply to providing that adequate means are supplied from some source.

The third Section not having the effect to limit the authority of the Legislature, as it regards the kind of taxation that may be resorted to, there remains only one additional source from which such a limitation could possibly arise, and that is Sections 1 and 3 read together. An argument drawn from a comparison of the last named Sections, and tending to limit taxation for the purpose contemplated by the third Section, to a tax on property, *ad valorem*, would have to be based on the idea, that because a particular kind of tax is mentioned in the second clause of the first Section, the third Section must be deemed to refer exclusively to and intend such tax. No such conclusion can arise from the direct sense of the terms, or from any implication proper to the structure of these Sections. If such a conclusion is to prevail, it can only result when there is no other tax that can fully satisfy the requirements of these two Sections. In other words, if we can find anything in

the nature of a tax on property, as contradistinguished from other modes of taxation, that can exhibit a motive in the Constitution to place that mode of tax, not only before all others, but to the exclusion of all others, then we may possibly have some ground for enquiring whether these Sections, construed together, evince an intent to make such a distinction; if no ground for such motive can be found, there is nothing to rest such a construction upon. If, on the contrary, the obvious motive lies in the opposite direction, then such construction would not only be faulty, but subversive of the intent of the Constitution.

An examination of the nature of these modes of taxation, and the effect of confining resort, under all circumstances, to the one, to the exclusion of all other kinds, cannot but establish the conclusion that such a mode of proceeding would violate the spirit and intent of the Constitution, as expressed in Section 1, Article IX, to the effect that " the General Assembly shall provide by law for a uniform and equal rate of assessment and taxation," and, also, as expressed in the last clause of Section 36, Article I, which is as follows : " Each individual of society has a right to be protected in the enjoyment of life, liberty and property, according to standing laws. He should, therefore, contribute his share to the expense of his protection, and give his personal service when necessary."

A just and equal system of taxation requires that all that receive protection from the government should contribute to its support, and so Section 36, Article I, in effect, defines it. Government not only protects the life, personal liberty and realized possessions of the citizen, but protects him as well in respect to his occupation or means of obtaining support and making accumulations. The poll tax may be regarded as representing the amount of personal contribution that each individual should make, independent of the nature of his property or occupation. The tax on property equalizes the burden fairly, so far as it is a contribution on account of the property held by the individual. If business or occupation, as distinguished from property, ought to contribute its share, then some other mode of taxation than those enumerated must be resorted to.

There are two kinds or classes of business that should be considered in this connection. One class is characterized by the fact that the profits of the business sustain some kind of relation, fixed or variable, to the amount of capital employed in the business. In

the other class of occupations the profits. are not limited by, nor proportioned to, the amount of capital employed, using the word capital as meaning tangible property in some form. It will only be necessary to give a single instance as illustrative of each of these classes. To the former belong mercantile occupations, to the latter the professions. A tax on capital, considered as property, may, to a certain extent, reach the class who operate on capital, but even then the *ad valorem* principle yields a very imperfect result, considered as a tax on business, for the reason that the relation between the amount of capital and of profits varies through wide limits, as between the different kinds of business. A property tax cannot, however, reach those occupations, so as to act as a tax on occupation, where no necessary relation exists between the amount of profits realized and the amount of capital employed. A single instance may be taken from the commercial classes that illustrates the whole question. A merchant usually requires capital invested in merchandise as the basis of his business operations; a broker, on the other hand, does not, beyond an inconsiderable amount, to enable him to conduct his business. The one pays taxes on his merchandise, considered as capital, the other pays nothing, so far as it regards the means employed for carrying on the business. The protection afforded by government is as important to the broker or to the professional man as to the merchant; yet, under a tax laid on property, exclusively, he escapes contribution so far as the profits of his business are concerned.

Whether at any particular time the one description, of tax, or both descriptions, will be most equal and productive, is a question for the Legislature ; but to hold that the Legislature must confine itself to one of these modes of taxation, to the exclusion of the other, is to exempt, by the Constitution, certain persons pursuing particular avocations from the necessity of contributing to the support of the government, as it regards the profits or advantages of such occupations.

Are we then at liberty to ascribe such an intent to the Sections under consideration? If such was the expressed intent, we would only have to declare that such is the will of the supreme authority of the State. But as we are called upon to enlarge the sense of the Constitution, on the ground of construction, and can only do so by a resort to certain implications based upon the reason and justice of the case, we are precluded from adopting such a construction, upon

considerations of justice and equality, not only enforced by the presumed intent of the Constitution, but by the express language already quoted.

We find, therefore, no ground in the Constitution for excluding the Legislature from resorting to a tax on occupations in aid of taxes imposed on property.

It remains only to consider whether the fact that the Act in question was passed and intended to take effect in a fiscal year in which a tax on property was laid in the usual manner and collected, affects its validity, on the ground that but one tax can be laid in any year.

The question is not whether it is unwise or oppressive to accumulate tax levies within any one year. We are bound to assume, unless the Constitution forbids such a tax as that under consideration, that it was necessary and called for by the circumstances of the case. This is an intendment due to every Act of the Legislature, passed with constitutional authority. The only question for us is, is such a tax forbidden by the Constitution, whatever may have been the necessities of the State that prompted its adoption.

The declaration that the Legislature shall levy an annual tax is the ground on which the argument against the constitutionality of the tax is based. We have seen that the leading object of this Section (Section 3, Article IX,) was to secure adequate means for the payment of current expenses and deficiencies of a past year, without resort to borrowing money. The Constitution intended, by this language, to say, in effect, that annually recurring expenditures must be met by annually recurring revenue. It is only extraordinary expenditures that can be postponed through the medium of a public debt. The object in view was substantial, not technical. The present objection is purely technical and formal. It proposes that all measures adopted by the Legislature in any one year, to provide income for its expenditures, must, as matter of form, be embraced in a single Act or statute, and must not consist of two distinct legislative Acts or resolutions. The objection is without force; it proposes stringency for system, to hamper the Legislature, instead of limiting it in a mode suitable to a due discharge of its functions. Its effect would be destructive, rather than constructive. If it is found convenient to mature the measures for the annual tax, in two or more distinct legislative enactments, no good reason can be assigned why the legislative action should not take that form.

One distinct Act might regulate the poll tax, another the tax on property, and a third a tax on occupations as distinguished from property, without violating the nicest sense of legislative propriety. The advantage of such a division of the subject is, that it presents the various matters for legislative consideration, in a separate and distinct form, and favors the full consideration of the merits, and the proper examination of each detail. The objection to such a course is fanciful, and without any foundation in legislative experience. The Legislature, during its sessions, may, if it please, make two or more distinct and separate provisions to secure adequate income from taxation to meet all expenses that should be liquidated from that source.

All such measures, whether in the form of Acts or Joint Resolutions, must be considered together as forming the single constitutional act of levying an annual tax, and the fact that the different taxes authorized call for different modes of procedure for their imposition and collection, does not interfere with their constituting a single tax in the sense of the Constitution.

The term annual tax, as employed in the Constitution in connection with the levying of taxes, is not new in the Constitutions of the various States. Its introduction may be traced back to the struggles that resulted in the overthrow of the system of imposing fixed taxes, that placed the revenues of the government in the hands of the Executive, and rendered unnecessary the annual convening of Parliament, substituting therefor a system under which the annual intervention of the representatives was necessary, in order to place the requisite means for maintaining government in the Executive hands. These familiar facts of constitutional history serve to account for the use of the word annual in the Constitution, without rendering it necessary to assume that some new and exceptional sense was intended to be attributed to the expression.

We cannot but consider the law under examination, as forming, with the customary levy of the year in which it passed, a single annual tax, in the proper sense of the Constitution, and therefore not open to the charge of inconsistency with the Constitution.

On the ground stated in the first part of this opinion, the judgment should be set aside.

*Moses*, C. J., and *Wright*, A. J., concurred.