528 S.E.2d 647

**JOYTIME DISTRIBUTORS AND AMUSEMENT CO., INC., Plaintiff,**

v.

**The STATE of South Carolina, Defendant.**

**No. 25007.**

Supreme Court of South Carolina.

Heard Oct. 12, 1999.

Decided Oct. 14, 1999.

Rehearing Denied Oct. 20, 1999.

Frank L. Eppes and L. Lee Plumblee, of Eppes & Plumblee, P.A., of Greenville, for plaintiff.

Attorney General Charles Molony Condon, Assistant Deputy Attorney General Robert D. Cook, Senior Assistant Attorneys General Nathan Kaminski, Jr., and Kenneth P. Woodington, Assistant Attorney General Christie Newman Barrett, and Assistant Deputy Attorney General J. Emory Smith, Jr., all of Columbia, for defendant.

James B. Richardson, Jr., of Richardson & Birdsong, of Columbia, and J. Boone Aiken, III, of Aiken, Nunn, Elliott & Tyler, P.A., of Florence, for Amicus Curiae PedroLand, Inc.

Reginald I. Lloyd, Counsel to the House Judiciary Committee, and Charles F. Reid, Counsel to the Speaker of the House, both of Columbia, for Amicus Curiae David H. Wilkins.

PER CURIAM:

This matter is pending in the Court's original jurisdiction. Plaintiff (Joytime) is a South Carolina corporation engaged in the video gaming industry with gaming machines located in several South Carolina counties. Joytime seeks a declaration as to the constitutionality of Act No. 125, 1999 S.C.Acts. Joytime asserts that Part II of Act 125 is an unconstitutional delegation of power by the legislature to the voters of this State and asks the Court to enjoin the enforcement of Act 125. The State has filed a brief contending that Act 125 is constitutional and, if not, the Act is severable. We agree with Joytime that Part II of Act 125 is unconstitutional but hold the portion of Act 125 which constitutes an unconstitutional delegation of power is severable from the remainder of the Act.

### Facts and Proceedings

Because the General Assembly was unable to agree on comprehensive video gaming legislation, the Governor, by Executive Order, called an extra session of the General Assembly to meet on Tuesday, June 29, 1999. Executive Dep't, State of South Carolina, Exec.Order No. 99–192 (signed by Governor James Hovis Hodges). During that extra session, the General Assembly enacted Act 125, which was ratified on July 1, 1999, and signed by the Governor on July 2, 1999.

Act 125 is legislation relating to video gaming machines and is composed of six parts. Part I prohibits cash payouts on video gaming devices effective July 1, 2000. Part II requires that a referendum be held "to ascertain whether or not video game machine payouts will continue to be allowed in this State." Act 125, Part II, § 9(1), 1999 S.C.Acts. The specific question voters are asked to consider is: "Shall cash payouts for credits earned on video. game machines continue to be allowed after June 30, 2000?" Act 125, Part II, § 9(2), 1999 S.C.Acts. Part III provides for regulation of the video gaming industry if the referendum called for in Part II results in a majority "yes" vote. Part IV deals with gambling losses and civil actions. Part V includes a severability clause, a savings

clause, and an intent section, and Part VI states the effective dates of the various parts and certain specific sections of the Act.

Joytime initiated this action on September 2, 1999, alleging that Act 125 is violative of the South Carolina Constitution. Prior to the expiration of the time for answering the complaint, the Attorney General petitioned this Court to hear the matter in its original jurisdiction. By order dated September 24, 1999, the Court granted the Attorney General's petition and ordered an expedited briefing schedule. The Court also granted the petitions of PedroLand, Inc., a South Carolina Corporation which owns and operates Class III video game machines (video poker machines) at locations in Dillon County, South Carolina, and David H. Wilkins, Speaker of the South Carolina House of Representatives, to appear as amici curiae.

Having considered the briefs and appendices filed with the Court, and the arguments of the parties at the hearing in this matter, we discuss the questions of whether Joytime has standing to bring this matter, whether the referendum constitutes an unlawful delegation of the legislature's power, whether portions of Act 125 are severable, whether it is proper for this Court to issue an injunction, and whether the surcharge on license fees is valid.

### Standing

■ PedroLand, as amicus curiae, asserts that Joytime does not have standing to prosecute this action. PedroLand contends that Joytime has not alleged an injury to differentiate it from the general public. We disagree.

■ Standing to sue is a fundamental requirement in instituting an action. A private individual may not invoke the judicial power to determine the validity of an executive or legislative act unless the private individual can show that, as a result of that action, a direct injury has been sustained, or that there is immediate danger a direct injury will be sustained. *Ex parte Levitt,* 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937); *Blandon v. Coleman,* 285 S.C. 472, 330 S.E.2d 298 (1985). Moreover, the injury must be of a personal nature to the party bringing the action, not merely of a general nature which is

common to all members of the public. *Citizens for Lee County v. Lee County,* 308 S.C. 23, 416 S.E.2d 641 (1992).

In this case, Joytime is required by Part II, § 9(4) of Act 125 to pay a license surcharge to fund the referendum. Further, Act 125 will directly affect Joytime's business. Part I of Act 125 bans video gaming machines as of July 1, 2000. Part III of Act 125 provides for more extensive regulation and taxation than that in effect when Act 125 was adopted and requires Joytime to connect to a central monitoring system.

Although this action is of general interest to all members of the public, in our opinion, Joytime has alleged an injury which is sufficiently personal to confer standing.

### Unconstitutional Delegation of Power

■ Joytime contends that the legislature unconstitutionally delegated its power to enact laws by enacting Part II of Act 125. We agree.

■ This Court has a very limited scope of review in cases involving a constitutional challenge to a statute. All statutes are presumed constitutional and will, if possible, be construed so as to render them valid. *Davis v. County of Greenville,* 322 S.C. 73, 470 S.E.2d 94 (1996). A legislative act will not be declared unconstitutional unless its repugnance to the constitution is clear and beyond a reasonable doubt. *Westvaco Corp. v. South Carolina Dep't. of Revenue,* 321 S.C. 59, 467 S.E.2d 739 (1995). A legislative enactment will be declared unconstitutional only when its invalidity appears so clearly as to leave no room for reasonable doubt that it violates a provision of the constitution. *Id.*

■ Article III, § 1 of the South Carolina Constitution states:

The legislative power of this State shall be vested in two distinct branches, the one to be styled the "Senate" and the other the "House of Representatives" and both together the "General Assembly of the State of South Carolina."

The Constitution of 1868 had an identical clause and had an additional provision, Art. I, § 41, which stated: "The enumeration of rights in this constitution shall not be construed to impair or deny others retained by the people and all powers

not herein designated are reserved for the people." In 1873, this Court was called upon to construe the two sections and stated the following:

> The true effect of this declaration [Art. I, § 41] is that it reserves to the people whatever is not granted by the instrument; as, for instance, the right to make changes in the form of government is not granted, and, under this clause, remains in the hands of the people, capable of exercise when they may see fit so to do. *As the legislative power is granted in express terms, importing a grant of general powers, such general powers of legislation cannot be regarded as reserved to the people* under this section. Such general language as that contained in section 41 of article 1 cannot be allowed such force and effect as to change entirely the nature of the legislative power, and to introduce anomalous ideas in the structure of the government.

*State v. Hayne,* 4 S.C. 403, 421 (1873) (emphasis added). The present South Carolina Constitution does not have a reserve clause similar to Art. I, § 41, and, since the constitution does not contain a specific provision reserving to the people the power to legislate, in our opinion, Art. III, § 1 requires the legislature, not the people, to enact the general law.

### Direct Legislation

In a direct democracy, the people are given the power to legislate directly. Direct legislation by the people may consist of initiatives by petition, referenda, and recalls. With initiatives by petition, a certain percentage of the voters of a state may propose by petition that a constitutional amendment or general law be enacted. If the subject matter of the initiative is not enacted by the lawmaking body, it must be submitted to the voters for ratification. A referendum is a vote by the people of the state as to whether to accept or reject a measure passed by the lawmaking body of that state. A recall allows the electors of a state to end the term of an elected official's office before its expiration date. William Munro, *The Initiative Referendum and Recall,* 1–2 (1912). Direct legislation grants the voters the option to propose legislation and decide state-wide policy issues themselves. It is direct democracy as

opposed to representative democracy. David B. Magleby, *Direct Legislation* (1984).

However, Article III, § 1, of the South Carolina Constitution provides for a representative form of government in this state as opposed to a direct democracy. In *Opinion of the Justices (Tax Plan Referendum)*, 725 A.2d 1082 (N.H. 1999), the New Hampshire Supreme Court considered whether a bill which proposed to allow the voters to determine which of two tax plans would be put into effect was unconstitutional direct legislation. The New Hampshire Constitution contains a provision that prohibits taxation "... without the consent of the people, or their representatives in the legislature, or authority derived from that body ..." N.H. Const. pt. I, art. 28. The court concluded that the phrase "the consent of the people" was not intended to establish a right of direct legislation on taxes, stating:

> Two broad rules of law apply in determining whether, and under what circumstance, the legislature has the authority to delegate its legislative powers to the voters. The first is that the legislature is prohibited from abdicating its legislative power.... The first rule is rooted both in the philosophy of John Locke—because the power to legislate is a delegated power from the people, the legislature has no power to delegate it to anyone else, ... and in the separation of powers doctrine....

*Id.* at 1090 (internal citations omitted). Like New Hampshire's constitution, this state's constitution is premised upon the philosophy of John Locke and this Court agrees with the statement made by the New Hampshire Supreme Court in 1881, and reaffirmed by that Court this year, that:

> The government organized by the constitution was considered to be, as it undoubtedly is, that of a representative republic, and no power existed in the legislature to convert it, on any occasion, or for any purpose, into a pure democracy. Legislative power can be delegated to towns only in local affairs. By the constitution, legislative power is vested not in the towns, but in the senate and house of representatives. And without a well established ground of exception, the senate and house are as incapable of delegating their legislative power, as the governor and council are of dele-

gating the power of pardon, or the court of delegating the power of deciding the constitutional question raised in these cases. All power is derived from the people, and all magistrates and officers of government are their agents, and at all times accountable to them. And these agents have not a general authority to avoid their official responsibility by relegating their duties to their assignees. If the legislative seats were filled with substitutes, it would not be claimed that a bill passed by them was law. The vote of a body of substitutes, assembled in the state-house or elsewhere, is not legislation, unless authorized by a legal construction of the constitution. . . .

*Id.* at 1087 (citing *State ex rel. Pearson v. Hayes,* 61 N.H. 264, 329 (1881)) (internal citations and quotation marks omitted).

The West Committee, charged in 1969 with recommending amendments to the Constitution of 1895, considered a proposal to amend the constitution to allow for direct legislation through initiative petitions and referenda. The proposal was summarily rejected. *Minutes of the West Committee,* September 16, 1967, page 72. Further, as late as 1996, a bill was introduced in the House which would have provided for an amendment to the constitution to allow for direct legislation by the people of the state. It was referred to committee and saw no further action. H.R.4479, 111th Leg., 2d Sess. (1996); [1996] I S.C. House J. 267–68.

In our opinion it is clear that our constitution does not give the people the right of direct legislation by referendum.

### Delegation of Authority to Execute Laws

On a number of occasions, this Court has held that the power to legislate cannot be delegated to private persons or corporations. *See State v. Watkins,* 259 S.C. 185, 191 S.E.2d 135 (1972). Although the legislature may delegate its authority to create rules and regulations to *carry out* a law, the legislature may not delegate its power to *make* the law. *DeLoach v. Scheper,* 188 S.C. 21, 198 S.E. 409 (1938); *State ex rel. Richards v. Moorer,* 152 S.C. 455, 150 S.E. 269 (1929). In discussing the distinction between making and carrying out the law, the Court in *Moorer* quoted J.G. Sutherland, *Sutherland on Statutory Construction,* § 68 (1891) for the following:

[The distinction] is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done. To the latter, no valid objection can be made.

*Id.* at 479, 150 S.E. at 297 (internal citations omitted). In the present case, it is clear that the legislature has not delegated merely the authority to execute a law but has delegated the authority to make a law.

### Constitutional Delegations of Lawmaking Authority

Article XVI, §§ 1 and 2 of our constitution provide that proposed constitutional amendments must be submitted to the voters. However, even in amending the constitution, the people of the state have not retained exclusive power. Although amendments to the constitution must be approved by the people, even if they are approved, the next General Assembly must still ratify the approved amendments by a majority vote before they become effective.[1]

 A number of other sections of the constitution specially require a referendum by the people who will be affected by the legislation. *See* S.C. Const. art. VIII, § 8 (incorporation of new municipalities); art. VIII, § 16 (acquisition and operation of public utilities systems); art. X, § 13 (bonded indebtedness of the state); art. X, § 14 (bonded indebtedness of political subdivisions); art. X, § 15 (bonded indebtedness of school districts). Under the maxim of *expressio unius est exclusio alterius* (the expression of one thing implies the exclusion of another) the inclusion of provisions for a referendum in certain circumstances means a referendum is not contemplated in other circumstances. *See Opinion of the Justices,* 725 A.2d at 1089 ("That the framers of our constitution knew how to employ language providing for a direct vote of the people on an issue of state-wide concern is evidenced by the provision for constitutional amendment.").

---

1. We note that in the *The Final Report of the Committee to Make a Study of the South Carolina Constitution of 1895* 123 (1969), a recommendation was made to delete the provision requiring ratification by the legislature after the people voted for an amendment. That recommendation was not adopted.

We hold that the silence of the constitution on the ability of the people to enact laws by referendum does not constitute an implied grant of that right.

## Act 125 as Contingent Legislation

 This Court has recognized the general rule that statutes that go into effect only on a certain contingency are constitutional. *Beaufort County v. Jasper County*, 220 S.C. 469, 68 S.E.2d 421 (1951). In Part V, § 22 of Act 125 the legislature acknowledges that there is no provision in the constitution which allows the people to enact laws by referendum. Section 22 attempts to justify the constitutionality of the Act by stating that the referendum will result in a "contingency that is certain" that will determine which parts of Act 125 take effect.

In *Beaufort County,* we stated:

The fact that the Legislature saw fit to make the Act effective only on the happening of a certain contingency does not affect the validity of the Act. The applicable rule is stated in 11 Am.Jur., p. 926, § 216, as follows: "The rule is well settled that while the Legislature may not delegate its power to make a law, it may make a law to become operative on the happening of a certain contingency of future event. Moreover, in general it makes no essential difference what is the nature of the contingency if it is essentially just and legal. The reason for this rule is that it is not always essential that a legislative act must in any event take effect as law after it leaves the hands of the Legislature. *If the law is in its provisions a complete statute in other respects, its taking effect may be made conditional upon some subsequent event.* When that event happens, the statute takes effect and becomes the law by force of legislative action as fully as if the time when it should take effect had been unconditionally fixed."

*Id.* at 488, 68 S.E.2d at 430 (emphasis added). In *Beaufort County,* the "event" upon which the legislation would become effective was a ruling that the legislation was constitutional. Since the legislation could not be effective if it were held unconstitutional, we question whether the Court even needed to address the issue. At any rate, here, the "event" is a vote

of the people as to *which portion* of Act 125 will become effective.

A majority of courts addressing this issue has rejected the argument that a vote of the majority of the people constitutes a certain contingency. In rejecting an argument that a referendum of the people sufficed as a contingent event, the court in *Ex parte Wall,* 48 Cal. 279, 315 (1874), stated:

> The Legislature cannot transfer to others the responsibility of deciding what legislation is expedient and proper, with reference either to present conditions or future contingencies. To say that the legislators may deem a law to be expedient, provided the people shall deem it expedient, is to suggest an abandonment of the legislative function by those to whose wisdom and patriotism the Constitution has intrusted the prerogative of determining whether a law is or is not expedient.

The court in *Barto v. Himrod,* 8 N.Y. 483 (1853), which is cited by most courts rejecting the theory that a vote of the people is an event upon which legislation may be contingent, explained:

> The event or change of circumstances on which a law may be made to take effect, must be such as in the judgment of the legislature affects the question of the expediency of the law: an event on which the expediency of the law, in the judgment of the law makers, depends. On this question of expediency, the legislature must exercise its own judgment definitively and finally. When a law is made to take effect upon the happening of such an event, the legislature in effect declare the law inexpedient if the event should not happen; but expedient if it should happen. They appeal to no other man or men to judge for them in relation to its present or future expediency. They exercise that power themselves and then perform the duty which the constitution imposes upon them.

*Id.* at 490. In our opinion, Act 125 cannot stand under the general rule regarding "certain contingencies."[2] Act 125 is .

---

2. Cases upholding conditional legislation as not being an unlawful delegation of power include: *Cargo of the Brig Aurora v. United States,* 7 Cranch (11 U.S.) 382, 3 L.Ed. 378 (1812) (suspension of trade with foreign nations contingent upon those nations' continued violation of neutral commerce of United States); *Opinion of the Justices,* 344 So.2d

not a "complete statute in other respects," and leaves to the majority of the voters the decision as to which portion of the Act is "expedient."

### State-wide versus Local Referenda

■ The State also asserts that there is no reason to distinguish a state-wide referendum from local option referenda which have been held valid. In the case of local options, however, the legislature has enacted a complete law and left to municipalities or other governmental entities, each having unique needs and circumstances, the decision whether the law will be effective. The Constitution mandates that the legislature provide by general law the powers, duties, and functions of counties and municipalities. S.C. Const. art. VIII, §§ 7 and 9. That the legislature may on occasion provide that local governments may, by popular vote, decide if a legislative enactment, relating to the local governmental entities' police, taxing, or other power, should have effect in that locality is not an unlawful delegation of legislative power. As stated in *Gaud v. Walker*, 214 S.C. 451, 462, 53 S.E.2d 316, 321 (1949) (quoting 11 Am.Jur. Constitutional Law, § 223):

> It is a well settled rule, supported with practical unanimity by the authorities, that the general doctrine prohibiting the delegation of legislative authority has no application to the vesting in political subdivisions of powers to govern matters which are local in scope.

Here, in contrast, the legislature has left it to the people to determine what the general law will be.

---

1196 (Ala.1977) (contingent upon continued federal appropriations); *Opinion of the Justices*, 287 Ala. 326, 251 So.2d 744 (1971) (increase in gas tax contingent upon future adoption of constitutional amendment); *State ex rel. Douglas v. Sporhase*, 208 Neb. 703, 305 N.W.2d 614 (1981) (issuance of permit to transfer water out of state contingent upon reciprocal statutory provision in sister state); *State v. Padley*, 195 Neb. 358, 237 N.W.2d 883 (1976) (raising speed limit contingent upon presidential termination of federal conservation act); *Diversified Inv. Partnership v. Department of Social & Health Services*, 113 Wash.2d 19, 775 P.2d 947 (1989) (operation of statutes related to state reimbursement for nursing homes conditioned on no conflict with federal law that would jeopardize federal funding). These cases appear to stand for the proposition that the "contingent event" must be outside the control of the body enacting the law.

In our opinion, Part II of Act 125 constitutes an unconstitutional attempt to delegate to the people the legislature's power to set the policy of the state and enact laws to effectuate that policy.[3]

*Severability*

 Part V, § 20 of Act 125 is a severability clause which provides as follows:

> If any section, subsection, paragraph, subparagraph, sentence, clause, phrase, or word of this act is for any reason held to be unconstitutional or invalid, such holding shall not affect the constitutionality or validity of the remaining portions of this act, the General Assembly hereby declaring that it would have passed this chapter, and each and every section, subsection, paragraph, subparagraph, sentence, clause, phrase, and word thereof, irrespective of the fact that any one or more other sections, subsections, paragraphs, subparagraphs, sentences, clauses, phrases, or words hereof may be declared to be unconstitutional, invalid, or otherwise ineffective.

The State asserts that Part II, which requires the referendum, is severable from the remainder of the Act. The State argues that since Part VI, § 23(C) states that Part I becomes effective on July 1, 2000, if the referendum is found to be unconstitutional, video gaming will be outlawed on July 1, 2000. Joytime asserts that the Act is not severable and must be invalidated in its entirety. We agree with the State that Part II of Act 125 is severable.

 The test for severability is whether the constitutional portion of the statute remains complete in itself, wholly inde-

---

**3.** The State also contends that this Court's decision in *Chappell v. McCown,* 103 S.C. 6, 87 S.E. 147 (1915), refusing to enjoin a 1915 referendum on the manufacture and sale of liquor, was a decision on the merits and should be controlling here. The Court issued an order "On the Merits" which **declined** to address any of the reasons offered why the injunction should have been issued or why it should not and simply said it was unanimously of the opinion that the injunction should be denied because the petitioner had an adequate remedy at law. In our opinion, *Chappell,* as discussed below, stands only for the rule that courts will generally not enjoin the holding of an election and does not have any bearing on the question of whether a state-wide referendum is an unconstitutional delegation of legislative power.

pendent of that which is rejected, and is of such a character that it may fairly be presumed the legislature would have passed it independent of that which conflicts with the constitution. *Thomas v. Cooper River Park*, 322 S.C. 32, 471 S.E.2d 170 (1996); *Thayer v. South Carolina Tax Comm'n*, 307 S.C. 6, 413 S.E.2d 810 (1992). "When the residue of an Act, *sans* that portion found to be unconstitutional, is capable of being executed in accordance with the Legislative intent, independent of the rejected portion, the Act as a whole should not be stricken as being in violation of a Constitutional Provision." *Dean v. Timmerman*, 234 S.C. 35, 43, 106 S.E.2d 665, 669 (1959).

Initially we find that the severability clause in Act 125 is strongly worded and evidences strong legislative intent that the several parts of Act 125 be treated independently. This intent to treat the several parts independently is also evident in the Title to the Act. *See Lindsay v. Southern Farm Bureau Casualty Ins. Co.*, 258 S.C. 272, 188 S.E.2d 374 (1972) (it is proper to consider the title or caption of an act in aid of construction to show the intent of the legislature). The first clauses of the Title relate solely to Part I and end by stating the purpose as "prohibiting cash payouts for credits earned on video games machines on and after July 1, 2000." The first clauses are clearly separate from the next clause of the Title providing for the referendum in Part II of the Act, which we have determined is unconstitutional, and Part III, which regulates video games *in the event* Part I does not become effective.

The various substantive parts of the Act are also clearly separable: Part I, as previously stated, bans payouts on video game machines; Part II provides for the referendum; Part III regulates the video game industry and provides for revised penalties and license fees *if* the referendum results in a "yes" vote; and Part IV amends S.C.Code Ann. §§ 32–1–10 to –30, to allow for recovery of gambling losses only where the gambling activity which resulted in the loss is unlawful. *See Berkebile v. Outen*, 311 S.C. 50, 426 S.E.2d 760 (1993) (holding § 32–1–10, originally enacted in 1712 when the Statutes of Anne were adopted, applied to losses incurred in playing legalized video gaming machines).

Part VI of Act 125 sets forth the effective dates of the various parts of the Act. While Section 23(C) definitively states that Part I takes effect July 1, 2000, and Part IV takes effect on the governor's signature, the remaining effective dates are all contingent upon the outcome of the referendum contained in Part II.

Finally, the severability clause is followed by the intent clause in which, as previously noted, the General Assembly acknowledges that the constitution does not expressly provide for legislation by referendum. This acknowledgment, coupled with the severability clause, lends strong support to a finding that the legislature intended the referendum sections of the act be severable from the ban on video gaming.

Joytime asserts, however, that certain provisions in Act 125 became effective on June 1 and July 1 of this year and are only repealed in the case of a majority "no" vote; Act 125 contains no provision for their repeal without a referendum. Joytime contends this shows the entire Act is connected to the outcome of the referendum and Part II is incapable of being severed. However, those provisions relate, in the interim, to registering machines, to the number of video machines which are located on any one premise, and to casinos. The provisions are not inconsistent with the intent of the legislature to ban video gaming on July 1, 2000. Should the legislature fail to repeal those provisions when it reconvenes, they will be repealed by necessary implication. *Chris J. Yahnis Coastal, Inc. v. Stroh Brewery Co.*, 295 S.C. 243, 368 S.E.2d 64 (1988).

■ This Court must be hesitant to declare any portion of a statute unconstitutional, and may invalidate only the unconstitutional part where to do so does not impair the remainder of the statute. *Stone v. Traynham*, 278 S.C. 407, 297 S.E.2d 420 (1982). In harmonizing the several Parts of Act 125 we believe the intent of the legislature to sever the referendum portions of Act 125 is clear. We believe that Part I of Act 125 is capable of being executed independently of Part II without destroying the legislature's intent in passing Act 125 and invalidate only Part II and those other portions of Act 125 which rely on the outcome of the referendum to become effective.

## Propriety of Injunctive Relief

At oral argument, counsel for Joytime asked the Court to enjoin, not only the enforcement of Act 125, but the referendum itself. Traditionally, this Court has declined to enjoin elections since, after an election, an action at law may be brought to determine the validity of the results of the election. However, in a situation such as this, where the challenge to the referendum involves only a question of law we believe the Court should take action prior to the referendum being held.

In *Chappell v. McCown*, 103 S.C. 6, 87 S.E. 147 (1915), the Court was asked to enjoin the holding of a referendum which was very similar to the one at issue here. The General Assembly had passed an act calling for a popular vote on the question of continuing the manufacture and sale of liquor in the State. Act No. 76, 1915 S.C.Acts 88. That act provided that a majority "yes" vote would mean that all laws relating to the manufacture and sale of alcoholic beverages would remain in effect, and a "no" vote would repeal existing laws and make unlawful the manufacture and sale of liquor. A petition in the Court's original jurisdiction was filed seeking to have the referendum enjoined.

The Court, sitting *en banc* with eleven circuit court judges, issued an order refusing to issue an injunction and stating that the reasons for the denial would be reduced to writing at a later date. Some three months later, the Court issued an order entitled "On the Merits." However, the order specifically stated the Court declined to address any of the reasons offered why the injunction should have been issued or why it should not and simply said the Court was unanimously of the opinion that the injunction should be denied because the petitioner had an adequate remedy at law.

Prior to its decision in *Chappell*, the Court had decided *Parler v. Fogle*, 78 S.C. 570, 59 S.E. 707 (1907). In *Parler*, the Court stated:

> [T]he power to interfere by injunction to prevent the expression of the popular will by an election, if it exists, should be exercised with the greatest caution; and only where, under the well-recognized rule of equity, there is no other

adequate legal remedy, and it is made clear that an irremediable wrong will result from holding the election. However, the *Parler* Court also recognized that:

[C]ourts have enjoined popular elections ... where there was no constitutional or statutory authority whatever for holding them. This doctrine has been applied principally where it was proposed under an unconstitutional statute to hold an election, the result of which would affect property rights.

*Id.* at 575, 59 S.E. at 709.

In *Town of Hilton Head Island v. Coalition of Expressway Opponents,* 307 S.C. 449, 415 S.E.2d 801 (1992), this Court reaffirmed its holding in *Parler* that a court rarely, if ever, may enjoin the expression of the popular will. At issue in that case was the validity of an ordinance initiated by petition. The Court held that pre-election review of the validity of the ordinance was appropriate to determine if the ordinance was facially invalid. The Court stated it was "... convinced that if an initiated ordinance is facially defective in its entirety, it is 'wholly unjustified to allow voters to give their time, thought, and deliberation to the question of the desirability of the legislation as to which they are to cast their ballots, and thereafter, if their vote be in the affirmative, confront them with a judicial decree that their action was in vain....' " *Id.* at 455, 415 S.E.2d at 805 (quoting *Schultz v. Philadelphia,* 385 Pa. 79, 86, 122 A.2d 279, 283 (1956)).

In our opinion, the fact that the Court declined to review the merits of the petition for an injunction in *Chappell* is not dispositive of the present case. The Court in *Chappell* specifically declined to address the question of whether legislation by referendum was an unconstitutional delegation of the legislature's power.

We have determined that there is no constitutional authority for the referendum provided for in Part II of Act 125 and find this is one of those rare cases where an election should be enjoined.

### Surcharge on License Fee

Part II, § 9(4) of Act 125 provides for a one-time surcharge license fee of $50 per licensed machine to be used to

defray the costs of the referendum called for in Part II. Joytime states it paid the one-time surcharge fee on each license it holds under protest and contends that the fee imposed by Part II, § 9(4) violates various portions of the constitution. Because we have held that the referendum called for in Part II is unconstitutional, Joytime is entitled to a refund of the surcharge fees it has paid and the other constitutional arguments it raises are moot.

### Conclusion

In conclusion, we hold that in enacting Part II of Act 125, the General Assembly unconstitutionally delegated its power to enact the general law of this state and we invalidate Part II of the Act and enjoin the holding of the referendum. Since Part II of Act 125 is invalid, those portions of Part III of the Act which provide for regulation of the video gaming industry, contingent upon the referendum called for in Part II, are also invalid. Part I is a free standing enactment of the General Assembly, is severable from the unconstitutional portions of the Act, and is upheld. Should the General Assembly wish to revisit the ban on video gaming enacted in Part I when it meets next year, it may, of course, do so. Part IV of the Act is also a free standing legislative enactment which is severable from the unconstitutional portions of the Act and is upheld as constitutional. Finally, Joytime is entitled to a refund of the surcharge fees on its licenses it paid under Part II, § 9(4) of the Act.

Rule 221, SCACR, provides that a petition for rehearing must be received by the appellate court within fifteen days of the filing of an opinion of the court. Because of the nature of the decision we issue today, we find that the fifteen days allowed by Rule 221 should be shortened to five days. Accordingly, should any party desire to file a petition for rehearing, it must be received by this Court within five days of the date of this opinion.

This Court is directed by the constitution, and our precedent, to make every effort to find acts of the General Assembly constitutional. Citizens and organizations have expended a vast amount of effort and resources in anticipation of the referendum, and we take no pleasure in holding the referen-

dum unconstitutional. Although we may view the task with disfavor, and may have varying personal views on the merits of the controversy that surrounds video gaming, we cannot ignore precedent and our duty to interpret the constitution.