745 S.E.2d 385

TOWN OF ARCADIA LAKES, Robert L. Jackson, Linda Z. Jackson, Robert E. Williams, Barbara S. Williams, Elizabeth M. Walker, Louis E. Spradlin, Thomas Hutto Utsey, Tony Sinclair, Aaron Small, Bette Small, Gene F. Starr, M.D., Elaine J. Starr, Sanford T. Marcus, Ruth L. Marcus, and Steven Brown, Appellants,

v.

SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL and Roper Pond, LLC, Respondents.

Appellate Case No. 2010–159446.

No. 5095.

Court of Appeals of South Carolina.

Heard May 8, 2012.

Decided March 6, 2013.

Withdrawn, Substituted, and Refiled June 12, 2013.

516

518

Amy E. Armstrong, of South Carolina Environmental Law Project, of Georgetown, for Appellants.

W. Thomas Lavender, Jr. of Nexsen Pruet, LLC, of Columbia, and J. Michael Harley, of Barrington, IL, for Respondent Roper Pond, LLC; Roger Page Hall and Stephen Philip Hightower, both of Columbia, for Respondent SCDHEC.

THOMAS, J.

The Town of Arcadia Lakes (Town) and various individuals appeal a decision by the Administrative Law Court (ALC)

upholding the authorization by the South Carolina Department of Health and Environmental Control (DHEC) of coverage for certain land-disturbing activities under a State General Permit. We affirm.

## FACTS AND PROCEDURAL HISTORY

Respondent Roper Pond, LLC (Roper) is the owner and developer of 12.75 acres of real property on Trenholm Road in an unincorporated area of Richland County. The property includes 1.8 acres consisting of wetlands and waters that were identified by the United States Army Corps of Engineers (Corps) in 2005 as falling under the jurisdiction of the Federal Clean Water Act (CWA).[1] These jurisdictional wetlands include Roper Pond, a man-made pond that is visible from Trenholm Road but wholly within the boundaries of Roper's property. Before implementation of the project at issue in this appeal, water lilies covered the surface of Roper Pond.

Roper Pond drains through a pipe that runs beneath Trenholm Road and into Cary Lake. Cary Lake is privately owned by the Cary Lake Homeowners Association, which is not a party to this litigation. Although Cary Lake lies partly within the boundaries of the Town, the Town has no ownership interest in it and is not responsible for its maintenance or remediation.

In August 2007, Roper submitted to the Corps its initial plans for a multifamily apartment development to be built on its property. As part of this undertaking, Roper needed a permit for stormwater discharges from land-disturbing activities associated with the project. See S.C.Code Ann. § 48–14–30(A) (2008) (prohibiting land-disturbing activities without the submission of a stormwater management and sediment control plan to the appropriate agency and a permit to proceed with these activities); 9 S.C.Code Ann. Regs. 72–305 (Supp.2012) (stating similar prohibitions to section 48–14–30(A) and setting out the permit application and approval process).

To expedite matters, Roper could "seek coverage under a promulgated storm water general permit" instead of obtaining an individual permit. See 3 S.C.Code Ann. Regs. 61–9.122.26(c)(1) (2012) ("Dischargers of storm water associated

---

1. 33 U.S.C. §§ 1251 *et seq.* (2006).

with industrial activity and with small construction activity are required to apply for an individual permit or seek coverage under a promulgated storm water general permit."). Under 3 S.C.Code Ann. Regs. 61–9.122.28 (2012), DHEC is authorized to issue general permits for stormwater discharges from projects that meet certain criteria. Pursuant to this authority, DHEC issued Permit Number SCR100000 (State General Permit) on August 1, 2006. The State General Permit, which DHEC described as an "NPDES General Permit for Storm Water Discharges from Large and Small Construction"[2] covered discharges from the commencement of an authorized project until final stabilization of the construction site.

In 2006, DHEC published a Guidance Document for the State General Permit advising prospective permittees about the need to obtain necessary permits from the Corps. In this particular case, Roper was required under section 404 of the CWA to obtain a wetlands permit from the Corps because it intended to fill some of the jurisdictional wetlands on the project site. *See* 33 U.S.C. § 1344(a) (2006) (authorizing the Corps to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites").

Under section 404(e) of the CWA, the Secretary of the Army is authorized to issue Nationwide Permits (NWPs) for any category of similar activities involving discharges of dredged or fill material determined to "cause only minimal adverse environmental effects when performed separately" and to "have only minimal cumulative adverse effect [sic] on the environment." 33 U.S.C. § 1344(e)(1) (2006). If a proposed activity meets the applicable regional and general conditions for an NWP, application for its authorization can proceed more quickly than it would if the applicant sought an individual permit. On March 12, 2007, the Corps issued NWP 29 and NWP 39, the two NWPs at issue in the present litigation. NWP 29 applied to residential developments, and NWP 39 applied to commercial and institutional developments.

---

2. As authorized by the Clean Water Act, the National Pollutant Discharge Elimination System (NPDES) Permit Program controls water pollution by regulating point sources that discharge pollutants into waters of the United States. The program is administered by authorized states, including South Carolina.

The requirement for a 404 permit from the Corps in turn triggers a requirement under section 401 of the Clean Water Act for water quality certification that any discharge into navigable waters is consistent with federal and state water quality standards (401 certification). 401 certification is required "from the State in which the discharge originates or will originate." 33 U.S.C. § 1341(a)(1) (2006).[3]  On May 11, 2007, pursuant to its regulatory authority, DHEC issued 401 certifications for projects covered under NWP 29 and NWP 39.[4]  DHEC 401 certifications for all NWPs included general conditions that a given project must meet, including the requirement that DHEC, in reviewing a project for which coverage under an NWP is sought, would consider not only the land area directly impacted by each NWP request, but also impacts to adjacent water bodies or wetlands resulting from the activity.

On April 30, 2008, George Whatley, a wetland scientist for BP Barber, submitted a joint federal and state application for the proposed construction project on Roper's property.  On the application, Whatley noted the project would involve the filling of 0.075 acres of jurisdictional wetlands.[5]  On May 5,

3.  DHEC regulations reference this requirement as well.  *See* 8 S.C. Ann. Regs. 61–101.A.2 (2012) (stating federal law requires an applicant for a federal permit to conduct an activity that "during construction or operation may result in any discharge to navigable waters" "to first obtain a certification from [DHEC]" and stating that "Federal law provides that no Federal license or permit is to be granted until such certification is obtained").

4.  *See* 8 S.C.Code Ann. Regs. 61–101.A.3 (2012) ("[DHEC] may issue, deny, or revoke general certifications for categories of activities or for activities specific in Federal nationwide or general dredge and fill permits pursuant to Federal law or regulations."); 33 C.F.R. § 330.4(c)(1) (2013) ("State 401 water quality certification pursuant to section 401 of the Clean Water Act, or waiver thereof, is required prior to the issuance or reissuance of NWPs authorizing activities which may result in a discharge into waters of the United States.").

5.  As noted earlier, the CWA requires a 404 permit for certain discharges of dredged or fill material into navigable waters.  The term "navigable waters" is defined in the CWA as "waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7) (2006).  The United States Supreme Court has imposed limitations on the inclusion of wetlands, holding that *"only* those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own

2008, Whatley submitted a pre-construction notification (PCN) to the Corps. In the PCN, Whatley noted: (1) although Roper initially advised the Corps in 2007 that the project would impact 0.099 acres of jurisdictional wetlands, the project was redesigned to reduce impacts to 0.075 acres and (2) "best management practices" (BMPs) would be implemented to ensure that construction activities would not impact jurisdictional areas lying outside the permitted impact areas. Whatley further requested that the Corps review the project for possible coverage under an NWP; however, he did not specify any particular NWP under which the activity would be conducted.

No other impacts to water quality were disclosed on the application; however, according to subsequent e-mails between BP Barber and the Corps, Whatley notified the Corps that the project included lowering the elevation of Roper Pond and the discharge of the soil and sediment from the bottom of the pond into an upland area. According to the e-mails, Whatley inquired whether either of these was an impact to be considered in obtaining approval for the construction, and the Corps advised: (1) lowering the pond was not an impact and (2) excavation of the pond would be exempt from permitting requirements provided the excavated material was "placed in a truck or deposited onto uplands" and there was "[n]o double handling or stockpiling in jurisdictional areas."

Pursuant to the requirements for coverage under the State General Permit, a Stormwater Pollution Prevention Plan (SWPPP) was prepared for the project on June 26, 2008. DHEC reviewed the SWPPP and requested certain revisions.

By letter dated September 9, 2008, the Corps advised Whatley: (1) it reviewed the PCN and determined the proposed activity would "result in minimal individual and cumulative adverse environmental effects and [was] not contrary to public interest"; (2) the activity met the terms and conditions

right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the [CWA]." *Rapanos v. U.S.*, 547 U.S. 715, 742, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006) (emphasis in original). In the present case, the parties do not dispute that the 0.075 acres of wetlands to be filled in conjunction with Roper's proposed project were "jurisdictional wetlands" subject to the CWA.

of NWP 39; and (3) for authorization to remain valid, the project had to comply with general conditions of the NWP, regional conditions, and certain special conditions, namely, that Roper obtain and provide the Corps with "all appropriate state certifications and/or authorizations (i.e. 401 Water Quality Certification, Coastal Zone Management Consistency Determination, State Navigable Waters Permit)." Consistent with its usual practice, the Corps sent a copy of the September 9, 2008 letter to DHEC as well as to Whatley.

On September 24, 2008, Roper submitted to DHEC a notice of intent (NOI) to discharge storm water associated with its proposed project, now designated as Roper Pond Apartments, seeking approval from DHEC to have the stormwater discharges covered under the State General Permit.[6] According to the NOI, the project site was 12.8 acres, of which 9.9 acres would be disturbed by land-clearing activities.

DHEC responded to Whatley by letter dated October 2, 2008, advising it determined that the impacts of the project on water quality would be minimal and that the proposed work would be consistent with the 401 certification issued in 2007 for NWP 39, subject to various conditions not at issue in this appeal.

On November 17, 2008, DHEC staff engineer Jill Stewart e-mailed BP Barber to express various concerns. Among these concerns was information she received that the proposed plans for Roper Pond Apartments included lowering of the water surface elevation of Roper Pond to allow for detention of post-development runoff of stormwater. Stewart inquired whether the dropping of the water surface elevation should be taken into account in determining if a site is eligible for coverage under NWP 39. BP Barber responded the following day, informing Stewart that its wetlands consultant advised "the lowering of the water surface elevation is included and covered under [NWP 39]."

In December 2008, DHEC issued a letter acknowledging it was satisfied that the revised SWPPP met the requirements of the State General Permit and the applicable regulations. On

6. The NOI was on a DHEC form entitled "Notice of Intent (NOI) for Stormwater Discharges from Large and Small Construction Activities, NPDES General Permit SCR100000."

December 15, 2008, DHEC staff granted Roper coverage under the State General Permit for its stormwater discharges associated with construction of Roper Pond Apartments.

By letter dated December 30, 2008, Appellants and other individuals requested that the DHEC Board review and over-turn the decision.[7] Among the technical issues raised in the letter were Roper's failure to disclose its intent to lower the elevation of Roper Pond and an allegation that it sought coverage under the wrong NWP. On January 14, 2009, DHEC responded to the letter, informing Appellants that the Board declined to conduct a final review conference and that anyone aggrieved by the decision could request a contested case hearing in the ALC. On February 16, 2009, Appellants filed a request for a contested case hearing in the ALC.

Meanwhile, on January 6, 2009, Whatley e-mailed the Corps requesting a corrected letter indicating the impacts of the project would be covered under NWP 29 instead of NWP 39. As noted earlier, Whatley also recounted Roper's plans to lower the elevation of Roper Pond and its intent to remove the excavated material to an upland area and his understanding that Roper did not need approval from the Corps for these activities. By letter to Whatley dated February 25, 2009, the Corps advised that it determined the proposed activity would result in minimal individual and cumulative adverse environmental effects, would not be contrary to the public interest, and met the terms and conditions of NWP 29. Except for the particular NWP referenced, the language in the February 25, 2009 letter was identical to the corresponding language in its September 9, 2008 letter.

As it did with the September 9, 2008 letter, the Corps sent a copy of its February 25, 2009 verification letter to DHEC. DHEC, however, did not issue another authorization letter advising Roper that the project would be consistent with the 401 certification issued in 2007 for NWP 29. According to Charles Hightower, DHEC's Section Manager of the 401 Wetlands Section, the purpose of such notification from DHEC is to provide an applicant assurance that the applicant's proposed project falls within the conditions of DHEC's

---

7. Additional facts about Appellants will be presented in the LAW/ANAL-YSIS section of this opinion.

401 certification. Hightower further testified that Roper's proposed fill of the 0.075 acres of jurisdictional wetlands satisfied the necessary conditions to receive 401 water quality certifications for both NWP 29 and NWP 39 and that because the requisite conditions had been met, Roper did not need to notify DHEC before proceeding with the project under NWP 29.

On June 17, 2009, in response to a motion by Roper to dismiss Appellants' request for a contested case hearing, the ALC issued a consent order in which the parties agreed to the dismissal of all claims raised by Appellants challenging the 401 certification and authorization to conduct activities under NWP 39 for the proposed development. The partial dismissal did not affect Appellants' claims and Roper's defenses in connection with the 401 certification and authorization under NWP 29.

The contested case hearing before the ALC took place on September 3 and 4, 2009. Stewart, Hightower, Whatley, and several individual Appellants testified. The record on appeal also includes depositions from various individuals, including Stewart and Hightower. In addition, Appellants called Seth Reice, Ph.D., a professor of ecology and biology at the University of North Carolina at Chapel Hill, as an expert on aquatic ecology. Although Reice admitted he previously opined that the proposed excavation of the Pond would have disastrous consequences, he now admitted this was only conjecture. Furthermore, Reice's primary interest was sedimentation, and he admitted he had no direct experience with excavation. When asked if he believed the land-disturbing activities conducted in conjunction with Roper Pond Apartments would have an adverse impact on Roper Pond, Reice stated only that "[i]t doesn't sound good" and he would "be surprised if they didn't," but declined to offer an expert opinion about the probable results. On cross-examination, Reice also stated he was not provided copies of Roper's SWPPP and except for what he heard at the hearing, had no knowledge of the BMPs that Roper intended to follow in order to minimize the impact of its construction activities.

On January 21, 2010, the ALC issued a final order upholding DHEC's approval of coverage under the State General

Permit on the merits and further finding that Appellants lacked standing to challenge DHEC's decision. On March 23, 2010, following a hearing on a motion for stay by Appellants, the ALC temporarily stayed its final order pending a decision on Appellants' motion for reconsideration.

By order dated April 1, 2010, the ALC denied Appellants' motion to reconsider and lifted the temporary stay. Appellants then filed their notice of appeal to this court.

## ISSUES[8]

I. Did the ALC err in finding Appellants lacked standing to challenge DHEC's decision to authorize coverage for Roper Pond Apartments under the State General Permit?

II. Did the ALC err in holding the 401 certification issued by DHEC was sufficient for a valid 404 permit and coverage under the State General Permit?

III. Did the ALC err in holding that Roper's proposed stormwater control activities could be covered under the State General Permit?

## STANDARD OF REVIEW

The standard of review that an appellate court is to apply to appeals from the ALC is set forth in the South Carolina Administrative Procedures Act (APA), specifically in section 1–23–610 of the South Carolina Code (Supp.2012). *Murphy v. S.C. Dep't of Health & Envtl. Control*, 396 S.C. 633, 639, 723 S.E.2d 191, 194 (2012). Under section 1–23–610(B), a reviewing court may reverse or modify a decision by the ALC if the substantive rights of the appellant have been prejudiced because of a finding, conclusion, or decision that: (1) violates constitutional or statutory provisions; (2) exceeds the agency's

---

8. The Home Builders Association of South Carolina has filed an *amicus curiae* brief asserting that Appellants seek to add an unnecessary step in stormwater regulation and nationwide permitting that would have adverse consequences for the construction industry, the housing market, and the public at large and that existing programs and regulations sufficiently protect the public interest in the permitting process. Because our rulings on the issues Appellants have presented are dispositive of this appeal, we decline to address these policy concerns. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating an appellate court need not address remaining issues when its disposition of a prior issue is dispositive of the appeal).

statutory authority; (3) is made upon unlawful procedure; (4) is affected by other error of law; (5) is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) is arbitrary, capricious, or characterized by either abuse of discretion or clearly unwarranted exercise of discretion. Section 1–23–610 has been applied not only to findings by the ALC on the merits of a controversy but also to findings by the ALC concerning a party's standing to maintain an action. *See Bailey v. S.C. Dep't of Health & Envtl. Control*, 388 S.C. 1, 4–8, 693 S.E.2d 426, 428–30 (Ct.App.2010) (referencing only the APA in stating the standard of review, but ultimately affirming the ALC on the ground that appellant lacked standing and declining to address appellant's remaining arguments), cert. denied (July 7, 2011).

## LAW/ANALYSIS

### I. Standing

Appellants in this case are: (1) the Town; (2) various residents of Kaminer Station, a subdivision adjacent to and uphill from Roper Pond (Kaminer Station Appellants); [9] and (3) various individuals whose properties border Cary Lake (Cary Lake Appellants).[10] The ALC found none of these groups had standing to maintain this action. We agree.

" 'Standing to sue is a fundamental requirement in instituting an action.' " *Bodman v. State of S. C.*, 403 S.C. 60, 66, 742 S.E.2d 363, 366 (2013) (quoting *Joytime Distribs. & Amusement Co. v. State*, 338 S.C. 634, 639, 528 S.E.2d 647, 649 (1999)). "When no statute confers standing, the elements of constitutional standing must be met." *Youngblood v. S.C. Dep't of Soc. Servs.*, 402 S.C. 311, 317, 741 S.E.2d 515, 518 (2013).[11]

---

9. The Kaminer Station Appellants are Robert L. Jackson, Linda Z. Jackson, Robert E. Williams, Barbara S. Williams, Elizabeth M. Walker, Louis E. Spradlin, Mary Helen Spradlin, Thomas Hutto Utsey, Toney Sinclair, Aaron Small, and Bette Small.

10. The Cary Lake Appellants are Gene F. Starr, M.D., Elaine J. Starr, Sanford T. Marcus, Ruth L. Marcus, and Steven Brown.

11. The ALC did not consider whether the "public importance" exception could confer standing on any of the Appellants, and Appellants have not raised this exception in their brief. *See Davis v. Richland*

██ In *Sea Pines Association for Protection of Wildlife, Inc. v. South Carolina Department of Natural Resources,* 345 S.C. 594, 601, 550 S.E.2d 287, 291 (2001), the Supreme Court of South Carolina, quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), set forth three requirements that must be met to satisfy "the irreducible constitutional minimum of standing":

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent", not "conjectural" or "hypothetical." Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

(Citations omitted).

██ "The party seeking to establish standing carries the burden of demonstrating each of the three elements." *Sea Pines,* 345 S.C. at 601, 550 S.E.2d at 291. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to withstand a motion to dismiss. *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130. Elements of standing, however, "are not mere pleading requirements but rather an indispensable part of the plaintiff's case"; therefore, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stage of the litigation." *Id. (quoted in Beaufort Cnty. v. Trask,* 349 S.C. 522, 528 n. 14, 563 S.E.2d 660, 663 n. 14 (Ct.App.2002)).

A. The Town

██ The ALC found the Town did not satisfy the first element required to establish standing, namely, that it had a

---

*Cnty. Council,* 372 S.C. 497, 500, 642 S.E.2d 740, 741 (2007) ("[S]tanding may be conferred upon a party when an issue is of such public importance as to require its resolution for future guidance.").

personal stake in the litigation. Quoting *Glaze v. Grooms*, 324 S.C. 249, 255, 478 S.E.2d 841, 845 (1996), the ALC referenced the general rule that "a municipality must allege an infringement of its own proprietary interests or statutory rights to establish standing." In response to this statement, Appellants advocate a broad interpretation of the term "proprietary interest" in determining whether the Town has demonstrated an injury in fact sufficient to confer standing. In the present case, Appellants argue "proprietary interests" include: (1) the Town's interest in protecting the environmental quality of Cary Lake, which lies partly within the Town borders; (2) the Town's ability to comply with federal law, such as NPDES regulations; (3) the Town's interest in maintaining its character and desirable attributes, including its aesthetic appeal: and (4) the diminution of property values within the Town and other adverse effects of a nearby apartment complex on such concerns as security and traffic congestion. We hold that none of these professed interests, whether "proprietary" or not, are sufficient to confer standing on the Town in this case.

As to the first two concerns, Town Mayor Richard Thomas testified in a deposition that the Town had no ownership interest in Cary Lake. Mayor Thomas gave a brief statement that under NPDES regulations, the Town was responsible for water that flowed out of Cary Lake, but provided no supporting authority for this assertion.[12] Moreover, he acknowledged the Town is not responsible for the maintenance of Cary Lake, has never allocated funds for this purpose, and has never incurred any fines under NPDES regulations despite alleged problems in the past with water flowing into Cary Lake. He also stated that Cary Lake is the "bottom lake," that is, the final lake into which the remaining six lakes flow. We also

---

12. In their reply brief, Appellants cite title 33, section 1342(p) of the United States Code (2006), which the United States Congress added to the CWA in 1987. This section covers municipal and industrial stormwater discharges. Under paragraph (4) of this section, the Administrator of the Environmental Protection Agency is required to establish regulations setting forth permit application requirements for discharges from municipal separate stormwater systems and either the Administrator or appropriate State agency would eventually acquire the authority to issue and deny such permits. We have found nothing in this section either requiring a municipality to obtain a permit for stormwater discharges from a stormwater system that is already covered by a permit or holding a municipality responsible for such discharges.

find significant the absence of any evidence from Appellants that the BMPs to be implemented under the SWPPP were inadequate to prevent sediment from leaving the construction site; thus, Appellants have also failed to show their alleged injuries are "fairly traceable" to the challenged action in this case. Similarly, Appellants have not shown any causal connection between the authorization of coverage to Roper for land-disturbing activities under the State General Permit and either of their two remaining concerns. Therefore, pursuant to section 1–23–610, we affirm the ALC's determination that the Town lacks standing.

B.  Kaminer Station Appellants

The ALC found the Kaminer Station Appellants failed to establish either an injury in fact from the permitting decision or a causal connection between the challenged decision and their alleged injuries. We agree with the ALC to the extent that it found that Appellants have failed to establish any injury that would be traceable to the permitting decision.

Linda Jackson, one of the Kaminer Station Appellants, conceded that "water flows down" and there was no serious concern that stormwater from Roper Pond would flow uphill to Kaminer Station. However, Jackson also described the visual appeal of Roper Pond and her appreciation of the nature sounds in the area. She also testified that she had fished on Cary Lake and had seen changes for the worse in that area as it developed. Such observations, even if shared by many others, arguably can still form the basis for a concrete and particularized injury that would confer standing. See Pye v. U.S., 269 F.3d 459, 469 (4th Cir.2001) ("[M]erely because an injury is widely held does not necessarily render it abstract and thus not judicially cognizable. . . . So long as the plaintiff himself has a concrete and particularized injury, it does not matter that legions of other persons have the same injury."). Moreover, even those concerns reflecting aesthetic or recreational interests have been recognized as "judicially cognizable injur[ies] in fact." Sea Pines, 345 S.C. at 602, 550 S.E.2d at 292. Nonetheless, when such interests involve property that is privately owned by a party other than the plaintiff, the presence of an injury in fact cannot be assumed. Cf. Conservation Council of N.C. v. Costanzo, 505 F.2d 498,

501–02 (4th Cir.1974) (stating the plaintiffs' recreational use of privately owned property as either licensees or trespassers did not confer standing to challenge development on that property because there was no evidence that the owner of the property would allow such use to continue in the future). Here, the affected bodies of water, Roper Pond and Cary Lake, are privately owned by parties other than Appellants.

Furthermore, we hold substantial evidence supports the ALC's determination that the Kaminer Station Appellants have not established a causal connection between their alleged injuries and the conduct giving rise to their complaint. When Roper's attorney asked Jackson to explain the injuries she would suffer if the land-disturbing activities for which coverage under the State General Permit was granted were managed properly, she responded only that "we don't know how it's going to be managed." Jackson also conceded that much of her dissatisfaction with prior construction in the area was due to violations of the applicable permits rather than the permits themselves. Furthermore, Reice's inability to offer a definitive opinion about the impact of the dredging of the pond supports the ALC's finding that the Kaminer Station Appellants have failed to meet the second requirement for standing.

## C. Cary Lake Appellants

Finally, we agree with the ALC that the Cary Lake Appellants failed to show that granting coverage for Roper Pond Apartments under the State General Permit would cause an actual or imminent injury and therefore lacked standing to challenge DHEC's decision to grant coverage under the State General Permit.

Testifying for the Cary Lake Appellants, Elaine Starr stated her home, where she has lived since 1971, borders Cary Lake, which is on the opposite side of Trenholm Road from Roper Pond. She further testified that she had a bachelor's degree in biology and had done graduate work in wetlands and coastal resources. She had participated in several organizations that were concerned with water quality, and she and her family have made extensive use of Cary Lake for recreational purposes. Starr testified about her empirical observations of the decline in the water quality of Cary Lake and how these

observations were supported by her use of a Secchi disk, a technique to measure water clarity. She also expressed concerns about the possible demise of the water lilies due to the dredging of Roper Pond, noting "if their [rhizomes] or root systems get damaged or taken way, ... they may not be there."

According to Starr, the increased sedimentation in Cary Lake that she described resulted from prior occurrences involving possible mismanagement. However, there was no evidence that the project at issue here would lead to similar results. Starr admitted she had not reviewed the SWPPP for the proposed project and was unable to offer any specific challenge to DHEC's determination that the SWPPP was not, under the terms of the State General Permit, a sufficient precaution against the consequences she claimed would result from the building of Roper Pond Apartments. Finally, similar to what we noted in our discussion about the Kaminer Station Appellants, the complaints of the Cary Lake Appellants primarily concern Roper Pond and Cary Lake, both of which are privately owned and maintained by parties other than Appellants, and are thus not injuries in fact. We therefore agree with the ALC that the Cary Lake Appellants presented at best only speculative evidence that they would suffer an injury in fact from DHEC's decision to allow Roper Pond Apartments to be covered under the State General Permit.

II.  Validity of the 401 Certification

     Appellants further argue the 401 certification issued by DHEC was insufficient to satisfy the requirements Roper needed to fulfill to obtain a 404 permit because: (1) the 401 certifications that DHEC issued for projects authorized under NWP 29 or NWP 39 could not apply to the excavation of the pond because that activity was not disclosed when Roper applied to the Corps for a 404 permit; (2) the project did not comply with certain general conditions applicable to all NWPs, specifically that DHEC consider the impacts to all land within a project boundary and to adjacent bodies of water or wetlands; (3) DHEC never issued a formal certification that the project met the conditions under NWP 29 for water quality certification; and (4) DHEC failed to conduct the required review for compliance with certain water quality regulations.

We hold none of these allegations warrant reversal of the ALC's finding that Roper had an effective 401 certification for its proposed project.

First, although Roper did not initially inform the Corps that it intended to dredge and excavate the pond as part of the project, as of January 6, 2009, when Whatley requested a corrected letter from the Corps indicating that the impacts of the project would be covered under NWP 29 instead of NWP 39, the Corps had been informed that such an activity was to be part of the project. Having received this information, the Corps nevertheless determined that the project would result in "minimal individual and cumulative environmental effects" and met the conditions of NWP 29.

As to Appellants' second argument, we agree with their position that the general conditions for water quality certification require DHEC to review the "overall project proposed by a single owner/developer," "includes all land within the project bound under single ownership," and is not confined to "the land area directly impacted by each NWP request" and their assertion that no one at DHEC undertook a complete examination of the impact of the project on all waters and wetlands at the project site or determined if feasible alternatives were available. Here, however, 401 certification was necessary only as a prerequisite to obtaining a 404 permit from the Corps for filling the jurisdictional wetlands. This requirement was pursuant to 33 U.S.C. section 1341(a)(1) (2006), which states in pertinent part:

> Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, *which may result in any discharge into the navigable waters,* shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, ... that any such discharge will comply with the applicable provisions....

(emphasis added). Appellants have emphasized they never argued that a 404 permit was necessary to dredge and excavate the pond, and there was no contention here that this activity would result in a discharge into a navigable water.

Furthermore, according to their brief, the specific "impacts" that Appellants maintain were overlooked by DHEC pertained

only to the pond. As Appellants point out, under DHEC's general conditions, Roper was required to: (1) demonstrate that impacts to wetlands have been avoided and that unavoidable impacts to wetland areas have been minimized; and (2) provide suitable compensation for any unavoidable impacts. Roper, as the owner of the property on which the pond is located, would be the proper party to object to impacts that have not been avoided or minimized and to enforce compensation for any unavoidable impacts. In other words, Roper would be placed in the illogical position of having to complain about its own project or to demand compensation from itself.

Based on our interpretation of the events in this case, we disagree with Appellants' third argument, their assertion that the project never received a proper water quality certification for coverage under NWP 29. We acknowledge Hightower admitted that after DHEC received notice from the Corps that the project would be covered under NWP 29, it did not issue a letter advising Roper that the project would be consistent with the 401 certification it issued for this NWP and agreed that sending such a letter would have been advisable; however, he also testified that an authorization letter was only a formality for the applicant's benefit and was not required by the State General Permit. The Corps verified that Roper's proposed work was eligible for coverage under NWP 29, and DHEC, consistent with its regulatory authority, had already issued a 401 certification for projects covered under NWP 29. A follow-up letter would have served only as documentation of this certification, and the absence of such a letter does not mean DHEC failed to issue a water quality certification for the project.

Finally, Appellants have challenged the water quality certification on the ground that DHEC failed to review the project to determine: (1) whether it complied with 6 S.C.Code Ann. Regs. 61–68 (2012) and 8 S.C.Code Ann. Regs. 61–101 (2012), both of which were promulgated pursuant to the South Carolina Pollution Control Act; and (2) the impact of the draining and excavation of Roper Pond. They further argue the ALC erroneously relied on *Responsible Economic Development v. South Carolina Department of Health and Environmental Control*, 371 S.C. 547, 552–53, 641 S.E.2d 425, 428 (2007), for the proposition that "a stormwater permit issued pursuant to

the Stormwater Act cannot be denied based on the regulations of the Pollution Control Act." We need not determine whether the ALC correctly applied this holding. We have already determined that the Corps was aware that Roper intended to excavate the pond when it authorized coverage under NWP 29 and that the 401 certification that DHEC issued for this NWP 29 satisfied the water quality certification requirement for a 404 permit.

## III. Coverage Under the State General Permit

Finally, Appellants take issue with the finding that Roper was entitled to coverage under the State General Permit. They submit two arguments in support of their position. We reject both arguments.

First, Appellants reiterate their previous argument that Roper was not entitled to coverage because the 401 certification was inadequate for a 404 permit, which in turn was a prerequisite for coverage under the State General Permit. We have already determined that the 401 certification that DHEC issued was sufficient for Roper to obtain coverage under NWP 29.

Appellants further contend that the excavation of the pond and lowering of its surface would make the pond a water control structure and would therefore require, under the terms of the State General Permit, a 404 permit from the Corps, which in turn would require a 401 certification. The ALC did not specifically address the question of whether the use of the pond as a water control structure required a 404 permit, and Appellants did not request a ruling in their motion to reconsider. The issue, then, has not been preserved for appellate review, and it would be improper for us to address it now. *See Shealy v. Aiken Cnty.*, 341 S.C. 448, 460, 535 S.E.2d 438, 444–45 (2000) (holding an issue was not preserved for appeal because the trial judge's general ruling was insufficient to preserve the specific issue for appellate review and the appellant did not move to alter or amend the judgment pursuant to Rule 59(e), SCRCP); *Hendrix v. Eastern Distribution, Inc.*, 320 S.C. 218, 218, 464 S.E.2d 112, 113 (1995) (vacating an opinion by this court "to the extent it addressed an issue which was not preserved").

## CONCLUSION

We agree with the ALC that none of the Appellants had standing to maintain their challenge to the authorization of coverage for Roper Pond Apartments under the State General Permit. As to the merits of Appellants' arguments, we affirm the ALC's ruling that Roper is entitled to this coverage.

**AFFIRMED.**

WILLIAMS and LOCKEMY, JJ., concur.